## UNITED STATES v. MacLEOD et al.
### Nos. 10879, 10880.

United States Court of Appeals
Seventh Circuit.

Nov. 5, 1953.

Eugene T. Devitt, John J. Kelly, Jr., Chicago, Ill., for appellant.

Otto Kerner, Jr., U. S. Atty., Richard G. Kahn, James P. Piragine, Asst. U. S. Attys., Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and DUFFY and SWAIM, Circuit Judges.

MAJOR, Chief Judge.

Defendants, Richard W. MacLeod and William R. Hopkin, were charged in seven counts of an indictment with the counterfeiting and conspiracy to counterfeit certain $10.00 Federal Reserve Notes, and the execution and possession of copper and zinc counterfeiting plates and photographic negatives, all with the intent to defraud the United States Government in violation of Sections 472, 474 and 371 of Title 18 of the United States Code.

Defendants' motion to suppress certain evidence, allegedly obtained by an unlawful search, was denied. The case proceeded to trial without a jury, and it was stipulated that the evidence adduced

at the hearing on the motion to suppress would be treated as evidence at the trial. The defendants were found guilty on all seven counts and, from the resultant judgment, appeal.

The sole contested issue here is whether the District Court erred in its denial of defendants' motion to suppress. The court, in ruling upon this motion, made a statement which we think must be regarded as a finding of fact, as follows: "Well, the Court is of the opinion, from all the facts and circumstances, based on their statements, and particularly on the actions of the defendants, * * * that they consented to the search, and that the search was legal, so the motion to suppress is denied in each case."

■■ Admittedly, the Secret Service agents had no warrant either for the arrest of the defendants or for the search of their premises. The search and seizure, therefore, can be justified only upon the ground of consent by the defendants. The District Court, after hearing testimony upon this disputed factual issue, made the findings above noted. In reality, the only question for our consideration is whether the record furnishes substantial support for such finding.

■ We have read the testimony and are convinced that the finding of consent is amply supported. Such being the case, we think there is no occasion to do more than briefly relate the evidence in support thereof. The search and seizure in controversy was made by United States Secret Service agents Deckard and Backstrom on January 27, 1953. The reason for the visit of the agents to the homes of the respective defendants on that occasion need not be related. It is sufficient to note that they had made certain previous investigations which, while revealing nothing incriminating against the defendants, were such as to cause the agents in the pursuit of such investigation to call at the home of MacLeod about 9:30 a.m. on the date above mentioned. The sole purpose of the visit was to make inquiry of MacLeod as to the use which he intended to make of certain copper plates and chemicals which the agents had ascertained by their previous investigation had been purchased by MacLeod under an assumed name.

The agents rang the doorbell of the apartment occupied by MacLeod, who opened the door. Agent Backstrom, followed by agent Deckard, walked in, announced they were from the Secret Service and showed MacLeod their credentials. MacLeod invited them into his apartment, and queried, "What is going on? What is this for?" The agents told him they were merely making an inquiry as to what he intended to do with the copper plates and chemicals which he had purchased on January 15. MacLeod stated they were being used to manufacture fictitious automobile and typewriter titles, which was a lie, but MacLeod testified he said this "so they would not think I was doing what I knew they thought I was doing." Backstrom then remarked that he did not need a title for a typewriter, to which statement MacLeod made no reply. Agent Deckard then asked MacLeod if he could use the bathroom, to which MacLeod replied, "Certainly." Deckard walked into the bathroom and observed large quantities of green, black, blue and yellow ink on the floor, the washstand, and the washtub. On his return he told MacLeod, "You certainly use a lot of ink."

The agents then asked MacLeod if he would consent to their looking through his apartment and he said he didn't have any objection. MacLeod and Deckard stood in the living room while Backstrom walked into the kitchen. There he found an etched copper plate. At this moment MacLeod said, "It is a wonder you fellows wouldn't have gotten a search warrant," whereupon the agents stopped and told him, "If you wish, we'll get a search warrant." To this MacLeod said, "No, that isn't necessary. Go ahead and search wherever you want to." In the dining room a carton was found containing numerous sheets of white paper with the Treasury seal and serial numbers imprinted on them. After this evidence

was discovered, MacLeod was placed under arrest.

The agents found a foot locker which was locked and which MacLeod agreed to open. Upon being unable to do so with a key, MacLeod removed the lock with a hacksaw. Incriminating evidence was found in the locker. Without any suggestion from the agents MacLeod went into a bedroom and carried out a hand printing press.

Having been informed by MacLeod that the copper plates were in the possession of his friend Hopkin, the agents then proceeded to Hopkin's residence. While Backstrom and MacLeod's wife remained in the car, agent Deckard and MacLeod went to the second flood of the building where Hopkin's room was situated. MacLeod knocked on the door and, in reply to Hopkin's question as to who was there, said, "It is me. You will never guess who is here." The door was opened and MacLeod exclaimed, "This gentleman is from his Majesty's government [or words to that effect]. He wants those plates I gave you last night." Hopkin invited them into the room and MacLeod repeated, "Give him the plates that I gave you last night." All this while, agent Deckard said nothing. Hopkin went to a little closet, opened a foot locker and came out with a brown manila envelope containing the counterfeiting plates, which he handed to Deckard. Hopkin then was placed under arrest. Deckard asked Hopkin if he could look further in the room, and Hopkin said, "If you want to look further, go ahead." A further search uncovered the photographic negatives. At no time does it appear that Hopkin voiced any objection to the search.

On cross-examination, agent Deckard testified that there had been no valid basis on which to procure a search warrant, that they did not get the name of MacLeod from anyone and that, at the time they rang MacLeod's doorbell, they did not know who the person would be who would open the door. He further testified that their thought had been only to make an inquiry to ascertain what the copper plates had been used for. As to Hopkin the same was true, as the only basis for their believing that the plates were going to be in his possession was the statement by MacLeod to that effect.

Defendants recognize the rule that a search and seizure without a warrant may be justified by consent, but they argue and cite cases in support of the proposition that the consent must be voluntary and not merely a peaceful submission to the demands of enforcement officers. The argument as an abstract legal proposition no doubt is sound but, in our view, it is without application to the facts of the instant situation, particularly so in view of the finding made by the District Court, which we think is substantially supported.

No good purpose could be served in the citation, much less an analysis, of the numerous cases relied upon by defendants. We shall only refer to Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L. Ed. 654, and Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, inasmuch as it is upon these two cases that defendants place their greatest reliance. While these cases, and particularly the latter, on first blush appear to afford support to defendants' contention, we think they are distinguishable when their facts are compared with those of the instant case.

In the Amos case, a wife in the absence of her husband admitted deputy collectors of internal revenue to defendant's home when informed that they were revenue officers "and had come to search the premises 'for violations of the revenue law'" [255 U.S. 313, 41 S. Ct. 267]. They entered and searched the premises, where they found illicit liquor. In response to the government's contention that the search and seizure without a warrant were legal, the court stated, 255 U.S. at page 317, 41 S.Ct. at page 268: "The contention that the constitutional rights of defendant were waived when his wife admitted to his home the government officers, who came, without

warrant, demanding admission to make search of it under government authority, cannot be entertained. * * * it is perfectly clear that under the implied coercion here presented, no such waiver was intended or effected."

In the Johnson case [333 U.S. 10, 68 S.Ct. 368], a detective lieutenant accompanied by other officers, suspecting that the narcotic laws were being violated in a hotel room, went to that room, knocked on the door and, in response to an inquiry from inside as to who was there, announced, "Lieutenant Belland." The door was opened and the officer informed the defendant, "I want to talk to you a little bit." According to the officer, the defendant "stepped back acquiescently and admitted us." The officer then informed the defendant, "I want you to consider yourself under arrest because we are going to search the room." The search revealed incriminating opium and smoking apparatus. The government sought to justify the search mainly on the premise that it was made incident to a lawful arrest of the person. The court points out that no crime was committed in the presence of the arresting officer and that no felony had been committed of which he had reasonable cause to believe the defendant guilty. Both the arrest and search were made upon what the officer observed after entrance to the room had been obtained. The court, in holding that both the arrest and the search and seizure were illegal, stated, 333 U.S. at page 16, 68 S.Ct. at page 370: "Thus the Government is obliged to justify the arrest by the search and at the same time to justify the search by the arrest. This will not do. An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion."

In both of these cases it was sought to justify the entrance and the search and seizure which followed on the basis that there was acquiescence by the defendants, an implied consent or waiver of the defendants' constitutional rights. The instant case is at once distinguishable because here, as the facts which we have recited disclose and as the court found, there was an express consent, with every indication that it was knowingly made, to the search and seizure. Not only did the defendants consent but they aided and assisted the agents in making the search. Of less importance perhaps in distinguishing the instant case from the two Supreme Court cases cited is the fact that the agents did not go to the MacLeod apartment for the purpose either of making an arrest or a search. Rather, they were there seeking an interview with him relative to certain of his activities about which the agents had information and which could have been either legal or illegal. It was for that purpose they were admitted freely and voluntarily by MacLeod. The arrest followed the search; the latter was not made as an incident to the former. It was only after the suspicion of the agents was aroused by what they saw that they had any occasion or reason for conducting a search and at that point, as we have already noted, express consent was given. What we have said relative to MacLeod is largely applicable to Hopkin. In addition, however, MacLeod directed or at least accompanied the agents to the room of Hopkin for the purpose of obtaining certain plates which MacLeod had turned over to Hopkin the evening before. It appears from the facts recited that entrance to Hopkin's room was obtained at the instigation of MacLeod rather than of the agent who accompanied him. In any event, it was through the request made by MacLeod to Hopkin that the plates be turned over by Hopkin that entrance was obtained, and Hopkin, like MacLeod, not only expressly consented to the search but assisted the agent in making the same. And again, the search was not incident to Hopkin's arrest; the latter followed the discovery of the incriminating evidence.

We think that the finding of the District Court that the defendants consented

to the search which was made of their premises is amply supported; in fact, it would be difficult to reach any other conclusion.

The judgment appealed from is Affirmed.