### CATALANOTTE v. UNITED STATES.
### No. 11780.

United States Court of Appeals, Sixth Circuit.

Dec. 1, 1953.

Louis M. Hopping, Detroit, Mich. (Robert D. McCear, Fitzgerald, Walker, Conley & Hopping, Detroit, Mich., on the brief), for appellant.

Vincent Fordell, Asst. U. S. Atty., Detroit, Mich. (Fred W. Kaess, U. S. Atty., Detroit, Mich., on the brief), for appellee.

Before SIMONS, Chief Judge, and ALLEN and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

On a wintry night in late February of 1952, about half an hour after midnight, a group of eleven officers, comprised of city policemen and federal narcotic agents, came to defendant's dwelling house in Detroit, Michigan. Four of the group surrounded the sides and rear of the house and two remained on the street in front. Five of the officers —all armed—walked up on the front porch, and one of them rang the doorbell and knocked on the door. The wife of appellant did not open the door at once, but looked through the door glass. One of the police officers then flashed his light on his badge so that she could see it. She was told that the officers wanted to see her husband; and, after three or four minutes, she opened the door and the five officers entered the house. Appellant had been in bed on the second floor. His wife and paralyzed daughter had just turned off the television and were preparing to go to bed.

Appellant came downstairs and was told by one of the officers that they wanted to talk to him concerning Sam Caruso's Packard car which was standing in front of appellant's home; and that they wanted to discuss with him the possession of his own car—an Oldsmobile—by Sam Caruso. They further informed him that Caruso and numerous others had been arrested in connection with narcotics.

Appellant inquired whether any narcotics had been seized at the time of the arrest of Caruso, and whether his Oldsmobile had been used to transport the drugs. The arrest of Caruso and others had actually been made some five hours before, pursuant to indictments returned by the grand jury serving in the United States District Court for the Eastern District of Michigan.

Appellant was asked whether he had narcotics in his home. He denied that he had. The officers demanded that he give them the keys to Caruso's Packard car. Whereupon, he went into the dining room. He was followed by a detective and, as he reached into the pocket of his coat, the officer held his hand. The policeman asserted that he feared appellant would reach for a pistol. No keys were found in the coat. Appellant then directed his wife to go upstairs and get the keys. He descended into the basement with the officers following him.

Upon reaching the basement, he sat down and his wife came downstairs with the automobile keys. One of the officers suggested that the appellant needed his slippers, because he was then in his bare feet. The wife again went upstairs and, when she returned, her husband told her that there was nothing to be excited about, that the officers were not going to find anything. On the way down to the basement, appellant had said: "The house is yours. You won't find any narcotics here." The officers acted upon this statement as a consent by appellant that his home be searched, although appellant denied that what he had said constituted such invitation, or consent.

The other six officers, who had been waiting outside the house, were called in and, for about an hour, a minute search from basement to attic was conducted. The officers had procured and were possessed of no search warrant or lawful writ, state or federal, to search or seize either the appellant or his residence, or any of his effects.

One of the officers found in the kitchenette a cardboard box containing a scale. On this scale, small particles of a white powder were found. The scale was taken down into the basement and two more federal officers, summoned by radiophone, arrived with an ultra-violet-ray lamp especially designed to aid in searches. If the white powder on the scale should show fluorescence, the presence of quinine sulphate (principal adulterant for heroin) would be indicated. One of the officers thought that a fleck of white powder on the scale tasted like quinine, or heroin.

Appellant was arrested and taken to the police station. The scale was carried away to headquarters and subsequent analysis resulted in a report by official chemists that there were traces of heroin on the scale. The scale was not produced at the trial.

Appellant was indicted on two counts: one charging the purchase on February 22, 1952, of one-tenth of a grain of heroin in violation of section 2553(a), Title 26, U.S.C.A., the other charging unlawful possession of the same and of the same quantity of heroin in violation of section 174, Title 21, U.S.C.A. Seasonably, before the trial, appellant filed a motion to suppress the evidence, supported by his own affidavit and that of his wife. After hearing testimony and argument on the motion, the district court denied it. The case came on for trial; and the defendant was found guilty and sentenced on both counts of the indictment.

■ Numerous assignments of error have been made, briefed and argued by appellant; but we are concerned with only one obvious error which requires reversal of the judgment below. In our opinion, the trial judge should have granted the motion to suppress the evidence. It seems clear that the state and federal officers violated the Fourth Amendment to the Constitution of the United States in searching unreasonably and without warrant the house of appellant, and in seizing the physical evidence without which he could not have been convicted.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

■ As declared by the Supreme Court in Grau v. United States, 287 U.S. 124, 128, 53 S.Ct. 38, 40, 77 L.Ed. 212, the guaranties of the Fourth Amendment are to be liberally construed "to prevent impairment of the protection extended." See also Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374; Gouled v. United States, 255 U.S. 298, 304, 41 S.Ct. 261, 65 L.Ed. 647; Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746. In the Gouled case, supra, 255 U. S. at page 304, 41 S.Ct. at page 263, 65 L.Ed. 647, the Supreme Court said: "It has been repeatedly decided that these amendments [the Fourth and the Fifth] should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous, executive officers."

■ In Bushouse v. United States, 6 Cir., 67 F.2d 843, 844, this court condemned a general exploratory search of premises by officers, even with a search warrant, "in the hope" that evidence of the commission of crime might be found. Mr. Justice Holmes in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, made it clear that "knowledge gained by the Government's own wrong cannot be used by it" to convict of a criminal offense.

■ The opinion writer for a unanimous court, in Agnello v. United States, 269 U.S. 20, 32, 33, 46 S.Ct. 4, 6, 70 L. Ed. 145, said: "The protection of the

Fourth Amendment extends to all equally—to those justly suspected or accused, as well as to the innocent. The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws. Congress has never passed an act purporting to authorize the search of a house without a warrant. On the other hand, special limitations have been set about the obtaining of search warrants for that purpose. * * * Safeguards similar to the Fourth Amendment are deemed necessary and have been provided in the constitution or laws of every state of the Union. * * * Save in certain cases as incident to arrest, there is no sanction in the decisions of the courts, federal or state, for the search of a private dwelling house without a warrant. Absence of any judicial approval is persuasive authority that it is unlawful. [Citing authority.] Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause."

■■ The last two sentences of the above quotation are quoted in the opinion of the Supreme Court in Johnson v. United States, 333 U.S. 10, 14, 17, 68 S.Ct. 367, 369, 92 L.Ed. 436. In that rather recent case, the Supreme Court reversed a conviction for violation of federal narcotic laws on evidence obtained by a search made without a warrant. There, where officers detected the odor of burning opium emanating from a hotel room, entered without a search warrant and arrested the only occupant and, searching the room, found opium and smoking apparatus, it was held that the search violated the Fourth Amendment. In the majority opinion, Mr. Justice Jackson stated that the right of officers to thrust themselves into a home is a grave concern, not only to the individual, but to a society which chooses to dwell in reasonable security and freedom from surveillance. He said further: "When the right of privacy must rea-sonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent." In his concluding paragraph, the jurist declared: "An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion. Any other rule would undermine 'the right of the people to be secure in their persons, houses, papers and effects,' and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law."

■ In the circumstances of this case, we are unable to construe the statements of appellant to the raiding officers—state and federal—that "the house is yours" and that "you won't find any narcotics here" as an invitation, or consent, by him that his home be searched for narcotics. He had probable cause to consider himself under duress, or even under arrest, at the time he made these statements. Without warrant of law and in violation of the Federal Constitution the officers had invaded his "castle" and were actually in possession of it at the time appellant made the statements. It is a reasonable assumption that almost any person, when a group of police officers had barged into his home in the dead of night indicating strongly that he was under investigation for crime, would be frightened into inviting the officers to go ahead and search his premises. We have noted with disapproval the growing tendency on the part of police officers to be very quick on the trigger in construing—and acting upon their construction—a statement of some known offender as an invitation to search his premises. The present case is a rather extreme example of this tendency; and the action of the officers involved herein is disapproved.

United States v. Adelman, 2 Cir., 107 F.2d 497, 498, cited by the Government, is quite dissimilar from the case at bar. In that case, the defendant Adelman,

when asked by narcotic officers who accosted him on the street whether he had any narcotics in his apartment, replied that he did not and invited the agents "to 'come up and see.'" The two agents and Adelman, with his companion, then proceeded to Adelman's apartment, which he opened with his key. He explained to his wife that the men were Government narcotic agents and she repeated the invitation to them to search the premises, which they did with the result that morphine was found. Here, the officers had entered appellant's home after midnight without a search warrant and, after they were in and had questioned him for some time, he told them "the house is yours" and that they would not find any narcotics in it.

Nor is the opinion of this court in Gatterdam v. United States, 6 Cir., 5 F. 2d 673, 674, cited by appellee, in point. In that case, it is plain that Gatterdam, who appealed from a conviction for violation of the National Prohibition Act, 41 Stat. 305, had consented to the search of his house where forty gallons of whiskey were found. The only factual dispute there was whether, when the prohibition agents requested permission to search the premises, the appellant stated that if he did not consent the officers would get a search warrant and that therefore they "might as well search now", or whether he consented to the search after one of the officers had said: "You might as well consent, because, if you do not, we will go and get a search warrant." It was held that, in either event, there was such consent to search given by Gatterdam that he could not complain of the evidence against him disclosed by the search. The case is, therefore, entirely dissimilar to that at bar upon the issue of whether consent to search was given.

We have no authority in the instant case to grant appellant's motion for an order directing the return to him of his seized automobile. Libel proceedings have been instituted to forfeit the ownership by appellant of the Oldsmobile and, whether its seizure was lawful or unlawful, is to be decided in a separate and distinct proceeding from the prosecution of appellant in the instant case. The seizure of the automobile was not used as evidence to secure appellant's conviction.

As stated at the outset, numerous other charges of error are made against the trial judge, but we deem it unnecessary to consider any of them, in view of our conclusion that the motion to suppress the evidence, without which appellant could not have been convicted, should have been granted.

The judgment of the district court is reversed; and the case is remanded for further procedure in conformity with this opinion.