**The UNITED STATES, Plaintiff-Appellee,**

**v.**

**Broadway ARRINGTON, Defendant-Appellant.**

**No. 11088.**

United States Court of Appeals Seventh Circuit.

Sept. 3, 1954.

Schnackenberg, Circuit Judge, dissented.

George F. Callaghan, Chicago, Ill., for defendant appellant.

Robert Tieken, U. S. Atty., Richard G. Kahn, Irwin N. Cohen, Asst. U. S. Attys., Ill., for plaintiff appellee.

Before MAJOR, Chief Judge, and SWAIM and SCHNACKENBERG, Circuit Judges.

MAJOR, Chief Judge.

Defendant having waived a trial by jury was tried by the court upon an indictment which charged a violation of Sec. 1708, Title 18 U.S.C.A., which provides in material part: "Whoever buys, receives, or conceals, or unlawfully has in his possession, any letter, postal card, package, bag, or mail, or any article or thing contained therein, which has been so stolen, taken, embezzled, or abstracted, as herein described, knowing the same to have been stolen, taken, embezzled, or abstracted * * *." (followed by the prescribed penalty). From the judgment predicated upon the court's finding of guilt, defendant appeals.

Defendant, prior to trial, by appropriate motion sought to suppress evidence obtained from his home by officers as the result of a search without a warrant, alleged to have been in violation of defendant's constitutional rights. A ruling on this motion was deferred until the conclusion of the trial, when it was denied on a finding by the court that the defendant had voluntarily consented to the search.

Defendant before this court seeks a reversal upon two grounds, (1) that the court erred in its denial of his motion to suppress evidence, and (2) that the evidence is insufficient to prove that defendant had knowledge that the property found in his possession was stolen.

This court, in an opinion announced May 28, 1954, found it unnecessary to pass upon the issue raised by defendant's motion to suppress for the reason that the evidence, other than that obtained by the alleged illegal search and seizure, was sufficient to authorize a finding of guilt. On further review of the record in connection with defendant's petition for rehearing, we are satisfied that the reasoning by which we previously affirmed is unsound and that the issue raised on defendant's motion to suppress must be decided. In fact, it is conceded by the government that if that issue is decided in favor of defendant, the judgment must be reversed. In view of the situation thus stated, our opinion previously announced is, on this petition for rehearing, vacated and set aside, and it is directed that it be stricken from the records of this court.

Defendant's motion to suppress was predicated upon his contention that evidence was obtained by an unlawful search of his home and that the seizure

therein of the alleged stolen property was in violation of the Fourth Amendment to the Constitution of the United States, which provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation * * *."

It is admitted that three officers, namely, Eppel and Dilley, both United States Postal Inspectors, and Delaney, a police officer of the City of Chicago, on January 14, 1953, entered defendant's home, searched and seized the evidence in question, without a warrant for his arrest or a warrant authorizing a search of his home. It is not claimed that the search and seizure was made incident to arrest but it is sought to be justified solely on the basis that it was made with the consent of defendant, and, as stated, the court made a finding in support of this theory and, therefore, denied defendant's motion to suppress.

■ We reach the conclusion that the court erred in denying defendant's motion to suppress. Such being the case, it will not be necessary to consider any other issue. The conclusion we have reached makes it important, we think, to review the record in some detail. Before doing so, however, it appears to be in order, lest they be forgotten, to reiterate some of the principles and admonitions uttered by the Supreme and other courts relative to the search of a man's home and seizure of property found therein.

In Go-Bart Importing Company v. United States, 282 U.S. 344, at page 357, 51 S.Ct. 153, at page 158, 75 L.Ed. 374, the court in condemning searches made in the absence of a proper warrant stated "The need of protection against them is attested alike by history and present conditions. The Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted. [Citing cases.]"

In McDonald v. United States, 335 U.S. 451, at page 453, 69 S.Ct. 191 at page 192, 93 L.Ed. 153, the court stated: "This guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike. It marks the right of privacy as one of the unique values of our civilization and, with few exceptions, stays the hands of the police unless they have a search warrant issued by a magistrate on probable cause supported by oath or affirmation. And the law provides as a sanction against the flouting of this constitutional safeguard the suppression of evidence secured as a result of the violation, when it is tendered in a federal court."

In Goldman v. United States, 316 U.S. 129, 142, 62 S.Ct. 993, 999, 86 L.Ed. 1322, the court stated: "Its protecting arm extends to all alike, worthy and unworthy, without distinction. Rights intended to protect all must be extended to all, lest they so fall into desuetude in the course of denying them to the worst of men as to afford no aid to the best of men in time of need."

In Agnello v. United States, 269 U.S. 20, 32, 46 S.Ct. 4, 6, 70 L.Ed. 145, the court stated: "While the question has never been directly decided by this court, it has always been assumed that one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein. [Citing cases.] The protection of the Fourth Amendment extends to all equally—to those justly suspected or accused, as well as to the innocent. The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws. Congress has never passed an act purporting to authorize the search of a house without a warrant."

In Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, the court stated: "The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of

privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

A number of such cases are reviewed in Catalanotte v. United States, 6 Cir., 208 F.2d 264. After such review, the court made a significant comment in 208 F.2d at page 268: "We have noted with disapproval the growing tendency on the part of police officers to be very quick on the trigger in construing—and acting upon their construction—a statement of some known offender as an invitation to search his premises. The present case is a rather extreme example of this tendency; and the action of the officers involved herein is disapproved."

▆ Notwithstanding the critical manner in which courts have thus treated the search of a home without a warrant, this court, as well as others, has recognized that the protection afforded by the Fourth Amendment may be waived by consent, provided it is freely, voluntarily and understandingly given.

In United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, the Supreme Court approved on disputed evidence a finding of consent by search in a case where the consent was obtained while the defendant was in the custody of police officers. However, it was emphasized and appears to have been the determinative factor that the defendant when taken into custody admitted his guilt and consented to the recovery of stolen property which he admitted was in his home.

In United States v. Asendio, 3 Cir., 171 F.2d 122, at page 124, the court refused to approve a finding that defendant had consented to the search of his premises and in doing so stated: "The federal agents and city policemen were a show of authority and force to which defendant merely submitted. As in the Johnson case [Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436], the arrest of defendant could be justified only by the search, and the search by the arrest."

In Judd v. United States, 89 U.S.App. D.C. 64, 190 F.2d 649, the court reversed a conviction on evidence obtained by a consent search, in which the cases dealing with such a search are cited. The Court, after pointing out that the consent was obtained while the defendant was in jail, among other things stated in 190 F.2d at page 650: "Searches and seizures made without a proper warrant are generally to be regarded as unreasonable and violative of the Fourth Amendment. True, the obtaining of the warrant may on occasion be waived by the individual; he may give his consent to the search and seizure. But such a waiver or consent must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied." And the court further stated in 190 F.2d at page 651: "Intimidation and duress are almost necessarily implicit in such situations; if the Government alleges their absence, it has the burden of convincing the court that they are in fact absent. This burden on the Government is particularly heavy in cases where the individual is under arrest."

The reasoning in the Judd case was reiterated by the same court in Nelson v. United States, D.C.Cir., 208 F.2d 505, at page 509, wherein it was stated: "It is clear from Judd and the many cases discussed therein that consent, like 'The fairness of a trial must be determined by appraisal of the whole rather than by picking and choosing among its component parts.' Only in that way can we ascertain whether consent is voluntary, i. e., given 'freely and intelligently,' without 'physical or moral compulsion.'"

In Higgins v. United States, D.C. Cir., 209 F.2d 819, the officers testified that defendant had given his consent, which was denied by the defendant. The court stated in 209 F.2d at page 820: "We assume for present purposes that the officers' testimony was true and the appellant's false. Even so, we think the record does not support the finding that appellant consented to the search. * * If a valid confession precedes a search by

**634**

police, permission may show true consent to the search. That was the situation in United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, on which appellee relies."

We now come to the evidence which bears upon the issue of consent. Postal Inspector Eppel testified that in the presence of Inspector Dilley and officer Delaney a conversation was had with defendant between eight and nine o'clock on the morning of January 5, 1953, at the Hyde Park police station. The defendant at that time was under arrest and in jail, with no charge against him. He testified that he told the defendant he had information that certain parcel post merchandise was in defendant's apartment; that he asked defendant if it was all right with him if he went to defendant's apartment and looked for the stolen goods; that defendant said, "Yes," that they could take anything in his apartment which they could identify as stolen property. Inspector Dilley testified to substantially the same conversation. Following this, the three officers, armed with guns and accompanied by the defendant, went to defendant's home, where his wife opened the door and permitted the officers to enter.

The postal inspectors testified that defendant, after they had entered his home, told them, "Go ahead, look around." The officers proceeded to search the home, discovered and seized the alleged stolen property described in the indictment, the admission of which as evidence was sought to be suppressed. The postal inspectors also testified that during the search defendant said to his wife, "I thought you would have enough sense to get rid of that stuff." Defendant's version of this conversation was that he said to his wife, "I told you to give that stuff back to Randolph [Haywood, the postal employee who had left the property at defendant's home]." Defendant denied making statements relied upon to prove consent, as related by the postal inspectors, either at the police station or in his home. The government contends that there being a conflict between the testimony of the postal inspectors and that of the defendant, the court was entitled to believe the former and disbelieve the latter. As an abstract proposition we agree with this contention.

The testimony which we have related is all that has been taken into consideration on the issue of consent. The government seeks to segregate this testimony from all the other facts and circumstances clearly shown by the record and apparently this policy was carefully pursued at the trial. There is, however, much more which we think is of vital importance. About four o'clock on the morning of January 5, 1953 (four or five hours prior to the time defendant was interviewed in the county jail by the postal inspectors), Delaney and other city officers, without defendant's consent, entered his home without a warrant either for the arrest of defendant or for the search of his home. These officers, after looking around, took defendant into custody and to the county jail where he was held without charge until the postal inspectors arrived.

Defendant testified that one of the city officers while in his home stated, "No sense in searching, I don't know what I am looking for anyway. We will have to take you in because the government wants you, the men from the postal inspectors want to see you and talk to you." On the way to the jail, one of the officers stated to the other, "I wonder if they [postal inspectors] are going to be responsible for the arrest." Delaney replied, "I know they will be." Delaney refused to inform defendant what he was charged with but told him, "Just wait until the fellow from the postal inspectors would come and talk to you." Defendant testified that Delaney was present during the time the postal inspectors interviewed him at the county jail and that Delaney stated to him, "I have been to your house, I know what you've got. * * * Come on, we are going to search your house."

None of defendant's testimony as to what Delaney said or did in defendant's home at four o'clock in the morning, or

what was said by the city officers on their way from defendant's home to the county jail, or the statement made by Delaney to defendant at the time his alleged consent was obtained by the postal inspectors, is denied. It is highly significant that Delaney, although available as a witness, was not called by the government to deny, contradict or explain defendant's testimony. There is a suggestion in the record that he was not called because the government did not want him submitted to cross-examination.

Neither is the testimony of defendant as to the statement made to him by Delaney in the county jail at the time the alleged consent was obtained and in the presence of the postal inspectors denied by them. Eppel admitted that he did not recall who first mentioned going to defendant's house, that it possibly was he but it might have been Delaney. Upon interrogation, he testified:

"Q. As a matter of fact, Inspector, didn't Delaney say to him, 'Broadway, I have already been to your house. I know what you have got in there, and we are going back and search it?' A. I can't say that he did.

"Q. Will you say that Delaney didn't say anything like that to him? A. I can't say one way or the other."

Inspector Dilley testified:

"Q. Who first suggested that you were going to his house? A. Inspector Eppel.

"Q. Did you hear Delaney mention his house? A. Well, in the course of the conversation when he said—he was explaining how Broadway was picked up.

"Q. Delaney said? Didn't he, during the course of that conversation, say 'I have already been to your house, Broadway, and I know what is there'? Didn't he? A. I am not sure of that remark, no sir. I cannot say that I heard it."

The government's neglect or refusal to call Delaney as a witness raises a strong inference that he could not or would not deny the statements attributed to him by defendant, and we think the latter's testimony on this score must be given credence for the further reason that it is consistent with the admitted facts and circumstances. Admittedly, Delaney had been to defendant's home, had brought him to the county jail and was present during the time the conversation between the postal inspectors and defendant took place. His statement to defendant that he knew what was in the house, and his command, "Come on, we are going to search your house," would under the reasoning of any case of which we are aware preclude a finding that defendant's consent was voluntarily given.

The government ignores the major role played by Delaney and relies entirely upon the testimony of the inspectors, independent and apart from the surrounding circumstances. The postal inspectors admitted that they had previously talked to the city officers regarding the defendant and suggested that in case he was picked up they would like to be notified. They deny, however, in an evasive and uncertain fashion that the city officers were acting on their behalf. The circumstances strongly indicate to the contrary. At any rate, it can be said with certainty that the federal and city officials were acting in cooperation. In Gambino v. United States, 275 U.S. 310, 314, 48 S.Ct. 137, 138, 72 L.Ed. 293, the court stated: "Evidence obtained through wrongful search and seizure by state officers who are cooperating with federal officials must be excluded."

We think the conclusion cannot be escaped that the entrance of Delaney and other city officers into defendant's home at four o'clock in the morning, without a warrant of any kind, taking him into custody and lodging him in the county jail without the preferring of a charge or even an accusation, was a brazen violation of defendant's constitutional rights. More than that, the federal officials cannot escape responsibility by treating what was said at the county jail

in a vacuum. In our view, the events preceding the search constituted a continuous maneuver, calculated and carefully designed, and they were tainted with illegality from the beginning to the end.

The government lays great stress upon the statement alleged to have been made by defendant to his wife during the search, "I thought you would have enough sense to get rid of that stuff." It is argued that this shows consent given at the county jail, on the reasoning that defendant thought his wife would dispose of the stolen property before the arrival of the officers. We think that legality of the entry to defendant's home must depend upon the circumstances existing at the time of such entry and not upon information acquired during and in connection with the search.

In United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 228, 92 L.Ed. 210, the court stated: "The Government's last resort in support of the arrest is to reason from the fruits of the search to the conclusion that the officer's knowledge at the time gave them grounds for it. We have had frequent occasion to point out that a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success."

In Takahashi v. United States, 9 Cir., 143 F.2d 118, 122, the court stated: "But, if it be established that there was an unlawful seizure of these documents, all declarations and statements under the compulsion of the things so seized, are affected by the vice of primary illegality."

In Worthington v. United States, 6 Cir., 166 F.2d 557, 566, the court stated: "The government argues that a so-called confession was properly admitted in evidence. This alleged confession, made after the arrest and search, and while appellant was in custody, cannot serve to make that legal which, in its inception, was illegal." The court then cited and quoted from Nueslein v. District of Columbia, 73 App.D.C. 85, 115 F.2d 690, 694 (opinion by Judge Vinson, later Chief Justice of the Supreme Court), as follows: " 'It has been held that a confession does not make good a search illegal at its inception. This is a part of the broader rule that an illegal search cannot be legalized by what it brings to light. That rule should not be narrowed even though an admission or confession is obtained. Officers should not be encouraged to proceed in an irregular manner on chance that all will end well.' "

 Thus, it is the rule that proof of a confession made during a search or contraband found as a result thereof cannot be relied upon in support of the legality of the search. By the same token, it would seem that the statement made by defendant in connection with the search could not utilized as proof of consent (the sole premise relied upon as justifying the search). In any event, the weight to be attached to the statement is of little consequence.

There is another circumstance which militates against the government's position, that is, there is not the slightest reason shown why the postal inspectors could and did not obtain a warrant authorizing the search of defendant's home.

In Johnson v. United States, 333 U.S. 10, 15, 68 S.Ct. 367, 369, 92 L.Ed. 436, appears the following pertinent observation: "No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons and, in these circumstances, certainly are not enough to by-pass the constitutional requirement. No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle." This quotation was reiterated in Trupiano v. United States, 334 U.S. 699, 706, 68 S.Ct. 1229, 92 L.Ed. 1663. In the same connection, the court in the latter case stated, 334 U.S. at page 705, 68 S.Ct. at page 1232: "In their understandable zeal to ferret out crime and in the excitement of the capture of a sus-

pected person, officers are less likely to possess the detachment and neutrality with which the constitutional rights of the suspect must be viewed. To provide the necessary security against unreasonable intrusions upon the private lives of individuals, the framers of the Fourth Amendment required adherence to judicial processes wherever possible."

These and other cases show that the courts have cast an increasingly critical eye upon the search by officers without a warrant, particularly where there was opportunity to obtain one. In United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59, the court stated: "Officers instead of obeying this mandate have too often, as shown by the numerous cases in this Court, taken matters into their own hands and invaded the security of the people against unreasonable search and seizure." See also Steeber v. United States, 10 Cir., 198 F.2d 615, 617, 33 A.L.R.2d 1425, and Drayton v. United States, 5 Cir., 205 F.2d 35, 37.

The government seeks to justify the search in the instant situation on the authority of two cases recently decided by this court, United States v. MacLeod, 7 Cir., 207 F.2d 853, and United States v. Sferas, 7 Cir., 210 F.2d 69, 70. It is true that in the MacLeod case we approved a finding of the trial court that the defendant consented to a search of his apartment. The facts of that case, however, differ so greatly from those here that it is of little, if any, benefit to the government. Without reviewing the facts of that case in detail, it is sufficient to note that the federal officers went to defendant's apartment not to make an arrest or search but merely for the purpose of obtaining an interview. Their entrance was not contaminated with any illegality. While they were in the apartment under these circumstances they discovered what was visible without a search, which led them to suspect the defendant. They offered to obtain a search warrant but were told by defendant it was unnecessary. MacLeod actively assisted in the search and brought forth incriminating evidence which the officers had overlooked and which perhaps their search would not have revealed.

Here, the defendant was in jail as a result of the illegal activities of the city officers acting in cooperation with the federal, with no charge against him, and at all times he denied that he had knowledge that stolen property was in his home. If we close our eyes, as the government would have us do, to all that the record discloses other than the testimony of the postal inspectors and accept it at full value, we have serious doubt if a finding of consent by the defendant could be justified. And when the entire record is considered, any doubt which exists is completely dispelled. It is high time that courts place their stamp of disapproval upon this increasing practice of federal officers searching a home without a warrant on the theory of consent, particularly where no reason is shown why a search warrant was not obtained. The protection afforded by the Fourth Amendment should not be made dependent upon the probity of an officer attempting to justify a search on consent. Otherwise, the rights guaranteed to the citizen by the Amendment will be impaired so as to become little more than an empty gesture.

Without retracting from our holdings in the MacLeod and Sferas cases, we think it can be fairly asserted that we went further in sustaining a finding of consent than has been done by any other court. In fact, the court in Higgins v. United States, D.C.Cir., 209 F.2d 819, 820, expressly disagreed with our holding in the MacLeod case. In our view, we would be required to go much further than we did in either of these recent cases in order to sustain the consent upon which the government relies in the instant situation. This we are not disposed to do.

The judgment is reversed and the cause remanded for further proceedings in accordance with this opinion.

SCHNACKENBERG, Circuit Judge (dissents).

Did the District Court err in finding, as a matter of fact, that defendant freely consented to the search of his home? If not, defendant's motion to suppress the evidence thereby obtained was properly overruled. There are many cases holding that a voluntary consent by a defendant to such a search prevents him from claiming that his constitutional rights were invaded thereby. One of the cases is in the Seventh Circuit, Milyonico v. United States, 53 F.2d 937. Moreover, in that case, as in the case at bar, there was no evidence that coercion or mental force was used. In this case there is the evidence of government witnesses which, if believed, shows that the defendant did so consent. While there is evidence which tends to prove the opposite conclusion, it obviously was not believed by the trial judge. The reviewing court has no right to *weigh* the evidence and determine which witnesses told the truth. The trial judge, who had the duty of *weighing* the evidence, had an opportunity to observe the witnesses as they testified and so had opportunities for judging their credibility, which are not afforded to a reviewing court. His decision on a matter of fact, which was supported by evidence which he deemed credible, should not be set aside by this court even though from a reading of the bare record we might come to an opposite conclusion. In Roberts v. U. S., 5 Cir., 151 F.2d 664, 665, the court said:

"What we said in Hargrove v. United States, 5 Cir., 139 F.2d 1014, is appropriate here:

" 'We are not triers of fact. The law, in its wisdom, does not authorize this court to substitute the reactions as to the facts which it gains from a perusal of the cold, printed type for those of the lower court which saw and heard the witnesses, observed their demeanor on the stand, and thus was placed in far better position to know the true and false than this court; * * *.' "

One of the circumstances corroborating the testimony of government witnesses to the effect that the defendant had consented to the search is his statement made to his wife while the search was going on, "I thought you would have enough sense to get rid of that stuff." According to government witnesses, defendant made that statement.[1] These words from the mouth of the defendant himself strongly indicate that his belief, that his wife would dispose of the stolen property before the officers returned to his home, had lulled him into a sense of security that a search would prove fruitless and hence his ready consent thereto would weigh heavily in his favor as a circumstance indicating innocence. The fact that he was to find himself disappointed in the realization of his belief in no way detracts from the fact that of his own volition he did consent to the search. Grice v. U. S., 4 Cir., 146 F.2d 849.

It is no doubt true that the legality of the entry to defendant's home on the occasion of the search must depend upon circumstances existing at the time of such entry. But the evidence shows that at the time defendant consented to the search, and up to and including the time of the entry into the home by the officers to make the search, the defendant believed that his wife "had enough sense to get rid of the stolen merchandise." We must not confuse this statement by the defendant made during the search with a *confession* made during a search and as a result thereof. The statement of the defendant now under consideration is not a confession, and proof thereof was not introduced for the purpose of showing a confession. The statement by him

---

1. Defendant testified his words were, "I told you to give that stuff back to Randolph" (Haywood). His wife testified he said "I told you to tell Haywood to take these things out of here."

was a circumstance which corroborated the government witnesses' testimony that he had already agreed voluntarily and freely to a search of his home.

The majority opinion, after citing Johnson v. United States, 333 U.S. 10, 15, 68 S.Ct. 367, 92 L.Ed. 436, and Trupiano v. United States, 334 U.S. 699, 705, 68 S.Ct. 1229, 92 L.Ed. 1663, says that these and other cases show that the courts have cast an increasingly critical eye upon the search by officers without a warrant, particularly where there was opportunity to obtain one. It is true that the Trupiano case followed the Johnson case. However, in the later case of United States v. Rabinowitz, 339 U.S. 56 at page 66, 70 S.Ct. 430 at page 435, 94 L.Ed. 653, the court said:

> "To the extent that Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, requires a search warrant solely upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case is overruled."

The court then makes this significant observation:

> "The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case."

In the case at bar, therefore, it is relevant to inquire whether the search was reasonable under the facts and circumstances. If it was, it is immaterial whether it was practicable to procure a search warrant; in that event none was needed. Going one step further, inasmuch as the District Court found as a fact that the defendant consented to the search (a finding which we as a reviewing court have no right to set aside), the search was reasonable and there was no reason, practical or otherwise, to procure a search warrant.

I would affirm.