UNITED STATES of America,
Plaintiff-Appellee,

v.

Glen William ZIEMER, Defendant-
Appellant.

No. 13230.

United States Court of Appeals
Seventh Circuit.

June 13, 1961.

William J. Bachman, Milwaukee, Wis.,
for appellant.

William J. Mulligan, Asst. U. S. Atty.,
Edward G. Minor, U. S. Atty., Milwaukee, Wis., for appellee.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Following a trial without a jury, the district court adjudged the defendant, Glen William Ziemer, guilty on three counts of an indictment charging counterfeiting operations in violation of 18 U.S.C.A. § 474, and sentenced him to four years imprisonment for each violation, to be served concurrently. Appealing therefrom, he relies on the failure of the court to grant his motion to suppress evidence. The court held a hearing on the motion. We state the salient parts of the evidence.

A former roommate of defendant reported in April of 1956 that a suit had been stolen. On March 3, 1960, Milwaukee police officers Franklin and Marx were ordered to talk to defendant about the theft of the suit and certain bed clothing. The officers testified that they entered the building in which defendant's rooms were located and were then directed to his door. In response to their knock, defendant, while partially clad, opened the door. The officers identified themselves, and defendant said he was Ziemer. He then put on his trousers in the doorway and talked about the stolen suit of clothes. Defendant became very nervous. When the officers asked if they could come into the room, he answered "I would rather not." Defendant asked why the officers seemed so interested in coming into the room, to which they replied they had asked for permission to look for the clothing, and that, if he had no knowledge of it, he would have nothing to hide. Thereupon defendant said "you may enter my room and you may look." He thereupon moved to one side of the door from the center where he had been standing. The door was open as far as the furniture in the room would permit.

Defendant testified that, when the officers asked, "You seem awfully interested in keeping us out; what have you got in there?", he said "Well, you can see what's here; there's a bed, television set and a dresser, and that's all there is in here." Then one of the officers said "You really don't mind if we come in, do you?" and defendant said "I certainly do mind." According to defendant, the officers came in and he "had to back up and * * * they were in the room". Defendant opened the door to an adjoining room to turn off a red photographic bulb burning there and the officers followed him.

Officer Franklin's testimony, covering events occurring after defendant said the officers could look for the clothing mentioned in the theft complaint, we set forth:

"Officer Marx proceeded first; I followed. In Mr. Ziemer's presence we moved to the closet which is a large walk-in type, and Officer Marx proceeded first in the closet. Mr. Ziemer followed Mr.—Officer Marx and I followed Mr. Ziemer, so Mr. Ziemer was between us. Officer Marx and I observed a pair of trousers which was lying on a book which covered a pan. Officer Marx picked up the pair of trousers and, in doing so, the book fell to the floor. In looking into the pan, about that far under the solution (indicating) there was what appeared to be a negative of a ten-dollar bill. Officer Marx moved to the doorway and into the bedroom proper. Lying on the floor was a flashlight. He picked this flashlight up, stepped back into the closet, shown its beam onto the tray, and at that time we did identify it as a negative of a ten-dollar bill and placed Mr. Ziemer under arrest."

After he was placed under arrest, Ziemer was asked if he had any more negatives or counterfeiting equipment in the room and he said, "Yes. I'll show you." He walked from the closet to the bed from under which he pulled a suitcase, opened it and showed the officers partially completed notes and some copper engraved plates. Pictures were taken of the equipment seized from Ziemer, and of the bed, two presses, a camera, a whirler, various chemicals, copper plates and counterfeit United States currency notes, as well as a belt worn by Ziemer, containing two places of concealment where he had $300 of legitimate money.

Defendant also testified that he requested Betty Koepsel to testify that she overheard him tell the detectives that they couldn't come into his room. However, she testified that Ziemer came to her apartment and requested her to testify that she overheard Ziemer tell the detectives that they couldn't come into his room, and that she told him she couldn't so testify because she didn't see or hear anything, whereupon Ziemer told her that "it wouldn't matter because nobody could prove that you weren't telling the truth".

Defendant testified that in 1941 he was convicted of a felony, possession of counterfeit material.

After hearing the testimony of all witnesses for both the government and the defendant and having an opportunity to observe their demeanor, the district court made this finding:

"Believing the testimony of the police officers and disbelieving that of the defendant, the court finds that the defendant voluntarily and knowingly consented to the search for the clothing and that while the officers were there with permission for that purpose, they saw the counterfeiting material and thereafter placed defendant under arrest. Defendant's motion for the return of seized property and suppression of evidence is hereby denied."

In United States v. MacLeod, 7 Cir., 207 F.2d 853, at page 854, we said:

" * * * The District Court, after hearing testimony upon this disputed factual issue, made the findings above noted. In reality, the only question for our consideration

is whether the record furnishes substantial support for such finding."

█ Even without the testimony of the witness Betty Koepsel, we would not feel justified in setting aside the finding of the district court that the defendant voluntarily and knowingly consented to the search in question. However, the correctness of the court's finding is emphasized by the dubious credibility of defendant's testimony, revealed by both his effort to induce Betty Koepsel to commit perjury on his behalf and his admission of prior conviction of a felony, a well-established method of impeachment. United States v. Senior, 7 Cir., 274 F.2d 613, 616. We cannot say as a matter of law that the finding of the district court was erroneous. Davis v. United States, 328 U.S. 582, 593, 66 S.Ct. 1256, 90 L.Ed. 1453.

█ Such evidence as defendant relies on to prove the opposite conclusion was obviously not believed by the trial judge. As a reviewing court we have no right to weigh the evidence and determine which witnesses told the truth. The trial judge's decision on a matter of fact, which was supported by evidence which he deemed credible, should not be set aside by this court even though from a reading of the entire record we might (although we do not) come to an opposite conclusion. As was said in Roberts v. United States, 5 Cir., 151 F.2d 664, 665:

"What we said in Hargrove v. United States, 5 Cir., 139 F.2d 1014, is appropriate here:

" 'We are not triers of fact. The law, in its wisdom, does not authorize this court to substitute the reactions as to the facts which it gains from a perusal of the cold, printed type for those of the lower court which saw and heard the witnesses, observed their demeanor on the stand, and thus was placed in far better position to know the true and false than this court; * * *.' "

In United States v. Arrington, 7 Cir., 215 F.2d 630, 634, we recognized that the protection afforded by the Fourth Amendment may be waived by consent, provided it is freely, voluntarily and understandingly given. However, in a majority opinion this court held that a reversal of defendant's conviction was required. That action was based upon a factual situation dissimilar to that in the case at bar.[1]

A defendant cannot claim that his constitutional rights were invaded where an entry and search of his premises was made with his consent and there is no evidence of coercion or mental force. Milyonico v. United States, 7 Cir., 53 F.2d 937.

1. In that case it appeared that about 4 A.M. January 5, 1953 (four or five hours prior to the time defendant was interviewed in the county jail by the postal inspectors), Delaney and other city officers, *without defendant's consent*, entered his home without a warrant either for the arrest of defendant or for the search of his home. These officers, after looking around, took defendant into custody and to the county jail where he was held without charge until the postal inspectors arrived.

Between 8 and 9 A.M. on the same day, while defendant was under arrest and in jail with no charge against him, a postal inspector testified that he told defendant he had information certain parcel post merchandise was in the defendant's apartment and asked defendant if it was all right with him if he went to defendant's apartment and looked for the stolen goods; that defendant said, "Yes", that they could take anything in his apartment which they could identify as stolen property. Inspector Dilley testified to substantially the same conversation. Following this, the three officers, armed with guns and accompanied by defendant, went to his home, where his wife opened the door and permitted the officers to enter.

The postal inspectors testified that defendant, after they had entered his home, told them, "Go ahead, look around." The officers proceeded to search the home, discovered and seized the alleged stolen property described in the indictment, the admission of which as evidence was sought to be suppressed.

The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable; that criterion in turn depends upon the facts and circumstances—the total atmosphere of the case. United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 94 L.Ed. 653.

We accept the district court's finding that the defendant voluntarily and knowingly consented to the search of his premises and no error was committed in the denial of defendant's motion for the return of seized property and suppression of evidence.

Accordingly, the judgment from which defendant appeals is affirmed.

Affirmed.

HASTINGS, Chief Judge (dissenting).

Because I feel that the record in this case conclusively indicates a violation of defendant's right to be secure in his home from an unwarranted search, I must dissent from the majority opinion of this court.

The search of defendant's apartment was carried out without a warrant. It is axiomatic that a "search and seizure may be made without a search warrant if the individual freely and intelligently gives his unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied. The Government has the burden of proving by clear and positive evidence that such consent was given." Channel v. United States, 9 Cir., 1960, 285 F.2d 217, 219–220.

At the outset, I feel that the court has taken an over-narrow view of our function in reviewing a case which raises important constitutional issues. The central question here is defendant's alleged waiver of his Fourth Amendment rights. The majority characterizes the issue of "consent," and the "voluntary" nature thereof, as a mere "matter of fact" which must be supported by substantial evidence. Reliance is placed on the trial court's unique opportunity to observe and judge the credibility of defendant and other witnesses.

This description of a constrained scope of review is consistent with that enunciated in the dissent in United States v. Arrington, 7 Cir., 1954, 215 F.2d 630, 638.

However, I feel that this and other courts have stated that a legal judgment is here involved. It is not so much what the facts are but their significance that is at issue. The majority opinion in Arrington confirms that this is the proper standard: granted that defendant and his witnesses were totally impeached, that the trial court disbelieved them, and that we must entirely disregard their testimony, nevertheless, we must independently determine whether the Government has produced evidence of the nature required to demonstrate defendant's consent to a waiver of his constitutional rights. See, United States v. Arrington, supra, 215 F.2d at page 637. For other recent concurring authority, see Channel v. United States, 9 Cir., 1960, 285 F.2d 217, 220; Judd v. United States, 1951, 89 U.S.App.D.C. 64, 190 F.2d 649, 652; United States v. De Vivo, D.C.E.D.N.Y. 1961, 190 F.Supp. 483, 486.

The issue is whether the Government's evidence, taken at its full value, is sufficient to support the constitutional and legal conclusion that defendant consented to a search. Mr. Justice Frankfurter, dissenting in Davis v. United States, 1946, 328 U.S. 582, 599, 66 S.Ct. 1256, 1264, 90 L.Ed. 1453, noted:

"The district court's finding that Davis voluntarily surrendered the documents is not one of those findings of facts which appropriately calls for our acceptance. When such a finding involves conflicting evidence or the credibility of a witness, the advantage of having seen or heard a witness may be decisive. But here the issue is not as to what took place but as to the significance of what took place. And when a district court's finding of a so-called fact is as interwoven as it is here with constitutional consequences, we

cannot accept a finding whereby the constitutional issue is predetermined. We are not bound by findings that operate as cryptic constitutional determinations * * *."

In examining the record in this case, assuming the truth of the statements of the police officers, the Government has failed to show the requisite "free and intelligent" consent, uninfluenced by implied coercion, given by defendant to waive his Fourth Amendment rights. Officer Franklin indicated that he and Officer Marx went at night time without a warrant to Ziemer's apartment to question him about a four-year old theft of a suit and bedclothes. After being summoned by the policeman's knock, Ziemer appeared at his doorway, clad in underwear shorts and a T-shirt. The officers immediately displayed their badges and identified themselves as Milwaukee city police officers. Defendant stood in his open doorway and blocked entry to his room; he then slipped on a pair of trousers.

At the beginning of the conversation defendant objected to the officers coming into his room.

The police commenced interrogation regarding defendant's relationship with Stegman, the complainant in the theft charge. Defendant said that he knew him and formerly roomed with him but that he knew nothing about the clothes alleged to have been stolen.

After Officer Franklin asked defendant if he knew whether Stegman had any relatives in the city, defendant answered that he knew of one person, but that he did not live in the neighborhood. Defendant said, "I will show you how to get there," but the officers refused, citing police regulations against making a trip of that sort.

Officer Franklin said defendant then "became very nervous." When asked how he observed this, the officer answered, "By his actions. His body was shaking."

Officer Marx confirmed that defendant was nervous, and this fact aroused the officer's suspicions. "We were there looking for this clothing; we were talking to him about it, and all of a sudden the man is very nervous. In our work, I mean when you see somebody nervous —we are questioning him regarding the theft of a suit and bed clothing—we figured it was probably in the room, and that's why we asked for permission to search his room, and he gave it to us."

For the second time the officers asked defendant for permission to enter. Defendant asked them why they seemed so interested in coming into his room. Officer Franklin replied that they were asking "his permission to look for the clothing; if he had no knowledge of it, he would have nothing to hide."

At this point, defendant moved to one side and said, "You may enter my room and you may look."

These facts indicate that defendant expressly told the police to enter. But such consent was given not voluntarily, but under the implied coercion of the police officers. The Government's evidence shows defendant first objected to entry, tried to lead the officers away from his apartment, became so nervous that he shook, then finally acquiesced in the request that the police enter to search his room. As stated in the case of Amos v. United States, 1921, 255 U.S. 313, 317, 41 S.Ct. 266, 268, 65 L.Ed. 654, "it is perfectly clear that under the implied coercion here presented, no such waiver was intended or effected."

As Chief Judge Major said in Arrington, supra, 215 F.2d at page 637:

"It is high time that courts place their stamp of disapproval upon this increasing practice of federal officers searching a home without a warrant on the theory of consent, particularly where no reason is shown why a search warrant was not obtained. The protection afforded by the Fourth Amendment should not be made dependent upon the probity of an officer attempting to justify a search on consent. Otherwise, the rights guaranteed to the citizen by

the Amendment will be impaired so as to become little more than an empty gesture."

With deference to the able trial judge who found that defendant voluntarily and knowingly consented to the search of his premises, I would find such holding to be in error and would reverse the judgment of conviction.