UNITED STATES of America

v.

LONG HUANG YOU, Defendant.

No. 01 CR 960(SAS).

United States District Court,
S.D. New York.

Feb. 28, 2002.

W.S. Wilson Leung, Assistant United States Attorney, United States Attorney's Office, Southern District of New York, New York City, for Government.

Lawrence A. Dubin, New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

On the morning of September 7, 2001, several agents from the Immigration and Naturalization Service ("INS") observed Long Huang You at Kennedy airport as he met an illegal alien and drove off with her in his car. That afternoon, the agents located You at his apartment, obtained his consent to search the apartment, and seized documents found during that search. After the search, the agents arrested You for conspiring to smuggle an undocumented alien into the United States in violation of 18 U.S.C. § 371. *See* Complaint ¶¶ 1–2.

You claims that the September 7th search violated his Fourth Amendment rights and moves to suppress all seized evidence. *See* 12/6/01 Notice of Motion; *see also* Affidavit of Long Huang You ("Def.Aff."), attached to 12/6/01 Memorandum of Law by Lawrence A. Dubin, Defendant's Attorney, in Support of Motion to Suppress ("Def.Mem."). An evidentiary hearing was held on January 4, 2002. For the reasons set forth below, the motion is granted.

## I. LEGAL STANDARD

### A. Seizure of a Suspect

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...." U.S. Const. amend. IV. "As our [Fourth Amendment] cases make clear, there are three levels of interaction between agents of the government and private citizens" with each level requiring a different degree of justification. *United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir.

1995). *First,* the police may initiate a voluntary encounter with an individual and ask questions as long as the person is willing to listen. *See Brown v. City of Oneonta,* 221 F.3d 329, 340 (2d Cir.2000). Such an encounter does not constitute a seizure and therefore does not require any justification nor "trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). *Second,* the police may briefly detain a person as part of an investigation if they have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). *Third,* the police may arrest an individual if they have probable cause to believe that he has committed a felony or a criminal offense in the police's presence. *See Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 1557–58, 149 L.Ed.2d 549 (2001). A consensual encounter ripens into a seizure, whether an investigative detention or an arrest, when a reasonable person under all the circumstances would believe he was not free to walk away or otherwise ignore the police. *See United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir.1992). "The test is an objective one based on how a reasonable innocent person would view the encounter." *Id.* (citations omitted).

**B. Search of a Suspect or His Property**

The Fourth Amendment also "generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson,* 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (per curiam). Warrantless searches "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreason-

able under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *See also Anobile v. Pelligrino,* 274 F.3d 45, 61 (2d Cir.2001).

■■■ "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041. *See also United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995) (citing *United States v. Sanchez,* 32 F.3d 1330, 1334–35 (8th Cir.1994)). *See also United States v. Lavan,* 10 F.Supp.2d 377, 384 (S.D.N.Y.1998). "Recent Supreme Court decisions emphasize ... that the issue of reasonableness is to be measured by an objective standard." *Garcia,* 56 F.3d at 423. When determining "objective reasonableness," the Court must ask: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 183–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). "Of course, this objective standard does not preclude an assessment of the particularities of the situation that [are] presented in any given case. On the contrary, it is still the totali-

ty of the circumstances that must be considered." *Garcia,* 56 F.3d at 423.

## C. Burden of Proof

 Once a defendant establishes a basis for a suppression motion, the government must prove that the search was proper by a preponderance of the evidence. *See Mendenhall,* 446 U.S. at 557, 100 S.Ct. 1870; *United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Calvente,* 722 F.2d 1019, 1023 (2d Cir.1983).

## II. UNCONTESTED FACTS

On Friday, September 7, 2001, Special Agents John Morris and Ernst Florvil were assigned to the INS's anti-smuggling unit. *See* 1/4/02 Transcript ("Tr.") at 10, 66. Around three o'clock that morning, Agents Morris and Florvil went to Kennedy Airport after having received information that a Chinese woman, who had illegally entered the United States, would be flying to the airport to met You. *See* Tr. at 10–11, 31, 67. At the airport, Agent Morris located the Chinese woman and followed her as she met You. *See id.* at 11, 34, 67. The agents followed You as he drove the woman towards New York City but they lost him in Brooklyn due to heavy traffic. *See id.* at 11–12, 34, 67.

At approximately 2:30 p.m., Agent Morris received a phone call from an informant who told him that You and his wife were, at that moment, in a lawyer's office in lower Manhattan. *See id.* at 12, 35–36, 67. Agent Morris and another agent went directly to the office, found You and his wife, and followed them by foot to Chinatown. *See id.* at 12, 35. You and his wife entered a building located at 60 Henry Street but the agents could not follow them inside because the front door had closed and locked by the time they arrived. *See id.* at 12, 35. The agents then instructed another informant to call their office if he spotted You and then "went back to [their] office to try to get other agents to come out and help with the surveillance." *Id.* at 12. *See also id.* at 35.

At 3:45 p.m., the informant contacted Agent Morris because he had seen You shopping on East Broadway. *See id.* at 13. Agents Morris and Florvil immediately proceeded to 60 Henry Street where they saw the defendant walking back towards his building carrying groceries.[1] *See id.* 13–14, 76; *see also* Def. Aff. ¶ 4. Morris, Florvil and the informant followed "[j]ust a few feet" behind You. Tr. at 14. All four men entered the building at the same time in single file. *See id.* at 14, 43.

You noticed the men and became "somewhat scared and suspicious because [he] did not recognize them and they were not Asians whereas most of the residents in [his] building are of Asian origin." Def. Aff. ¶ 6. Both agents and the informant followed You into the elevator and You pressed the button for the second floor. *See* Tr. at 14–15; 43–44. "At this point, [You] was very afraid, particularly because neither man pressed a button for a floor and [they] appeared to be going to my floor, following me." Def. Aff. ¶ 8. When the agents did follow You out of the elevator and down the hallway, "[he] was afraid

---

1. The testimony by Agents Morris and Florvil contradict each other on this point. Agent Morris testified that "[v]ery shortly after we arrived there, we saw Mr. You come *walking out* of 60 Henry Street carrying packages." Tr. at 13 (emphasis added). Agent Florvil testified that "Special Agent Morris and I drove to 60 Henry Street, and as we pulled up we saw the target [Mr. You] *walking towards* the building with shopping bags." *Id.* at 67 (emphasis added). *See also id.* at 76.

they were going to rob [him], or worse, cause harm to [his] nine month pregnant wife." *Id.* ¶ 9.

## III. CONTESTED FACTS

### A. The Varying Versions of the Events

The government and defendant contest what happened next. You claims:

> Prior to reaching my apartment, I turned and asked them in the limited English that I know: 'what are you doing?' Unfortunately, I could not understand their response. All of the sudden, one of the men went back down the hall and checked the elevator while the other man moved away as well to look down the staircase. Having been left alone for a moment, I rushed to my apartment, went inside and tried to shut the door. One of the men, however, forcibly stopped the door from closing and would not allow me to shut it. I believe he had wedged his foot between the door frame and was pushing the door open. He then entered the apartment without invitation. This same man then showed a badge and I believe he may have said "police" .... One of the officers then grabbed my shirt and said something to me. My wife's friend, who was in the apartment, approached and told the officers that I don't speak English and needed an interpreter. Both officers then stepped just across my doorway into the second floor hallway outside the apartment and ordered that the door

> stay open. Within a[sic] forty five minutes, several more people came, including a Chinese interpreter .... Through the interpreter an officer asked if they could search the apartment. Overwhelmed by their presence, I did not believe I could say no ....

Def. Aff. ¶¶ 9–23.

The agents' testimony as to these events was much different. According to the agents, after the four men (the two agents, the informant and You) exited the elevator, the informant immediately found a staircase and exited the building, *see* Tr. at 15, and Agent Florvil "ducked into a stairwell because [he] felt it better that only one of us follow him," *id.* at 68.[2] When You was about fifteen feet from his apartment, *see id.* at 45, the defendant turned to Agent Morris and said, "What problem?," *id.* at 15, to which Agent Morris responded that "[t]here is no problem here," *id.* at 68. *See also id.* at 15, 46. When Agent Florvil heard Agent Morris's voice, he exited the stairwell "in case there was something wrong." *Id.* at 68. Agent Morris then "walked away from Mr. You still in the hallway of the second floor" as You entered his apartment "through what was an already open door."[3] *Id.* at 16. Indeed, the door "was fully opened and secured open by a piece of wood." *Id. See also id.* at 48. You did not try to close the door behind him. *See id.* at 16, 47. "At that point, [Agent Morris] knocked on the already opened door and identified [him]self and asked if [he] could come in."[4] *Id.* at

---

**2.** Agent Morris did not mention that Agent Florvil also entered a stairwell, and Agent Florvil did not mention that the informant found a stairwell and left the building.

**3.** Agent Florvil did not testify that Agent Morris walked away from You after the confrontation but rather when he "got out of the stairwell," they "continued following until [they]

got to the door that the target went into." Tr. at 68.

**4.** The agents' testimony is inconsistent on this point. Agent Morris testified that he *"reached in* and knocked *on* the already open door." Tr. at 16 (emphasis added). Agent Florvil testified that "Agent Morris knocked *on the door frame* of the door itself ...." *Id.* at 68 (emphasis added). In addition, Agent Florvil

16. You was standing no more than a few feet from the door. *See id.* at 48–49. You "nodded his head as in yes and stepped to the side and motioned with his hand." *Id.* at 17. Agents Morris and Florvil entered the apartment and Agent Morris asked for identification from You and another man in the apartment. *See id.* 17, 68. It was clear that the men did not understand him. *See id.* at 17, 69.

A young Chinese woman then entered the kitchen from the back bedroom area and Agent Morris "asked her if she had any identification on her." *Id.* at 18. "She said yes and walked into the bedroom area to get it." *Id.* Agent Morris followed her and the woman produced a New York State driver's license. *See id.* at 18, 38. In the bedroom, Agent Morris saw You's pregnant wife, a child playing on the floor and a woman sleeping on the bed. *See id.* at 18. Agent Morris would later identify the sleeping woman as the illegal alien.[5] *See id.* at 19–20. Agent Morris did not see any contraband or other illegal activity in the apartment. *See id.* at 39–40, 80.

After Agent Morris asked You's wife for identification, the agents then went back into the hallway "because no one could understand me, and there was no sense in my being there if nobody could answer my question[s] or they couldn't speak to me." *Id.* at 19.[6] In the hallway, Agent Morris called his office to ask for a Chinese-speak-ing interpreter to come to the building. *See id.* at 19, 77. While waiting in the hallway, Agent Morris and Florvil stood about ten to fifteen feet outside the doorway. *See id.* at 19, 77. Because the door remained wide-open, the agents were able to watch the occupants. *See id.* at 19, 71. "They never really went towards the door at all. They just unpacked the groceries that the target had brought in that day, and they prepared a meal and sat down and ate." *Id.* at 71. *See also id.* at 19. The occupants were, according to Agent Morris, "[c]alm." *Id.* at 20. At some point, the woman who had been asleep in the bedroom walked into their view and the agents identified her as the illegal alien from the airport. *See id.* at 19–20, 27, 41.

While waiting in the hallway, four more agents joined Agents Morris and Florvil. *See id.* at 20, 56–58, 77–78. When the interpreter arrived approximately thirty minutes later, *see id.* at 25, Agent Morris knocked on the door, which was still "wedged open at the base of it up against the wall," *id.* at 68, and showed his credentials, *see id.* at 20, 50. Through the interpreter, the agents identified themselves and asked to enter the apartment. *See id.* at 20. You gave his permission and all six agents entered the apartment. *See id.* at 20, 50, 59. Agent Morris asked everyone in the apartment for identification. *See id.* at 20. Agent Morris then asked You if he

testified that he was identified by Agent Morris although Agent Morris did not mention this identification in his testimony. *See id.* at 16, 68.

5. Agent Morris's testimony was inconsistent about when he knew the illegal alien was inside the apartment. He repeatedly testified that he did not recognize the woman until he was in the hallway, after he had left the bedroom and apartment, and then illegal alien walked into his view. *See* Tr. at 19–20, 27, 41. But when he was asked whether he saw "anything that even came close to exigent circumstances" when he looked throughout You's apartment the *first* time, Agent Morris

responded: "Only the fact that the girl who was in the apartment and—it was our information that she was not with her true relatives at that time. So there was fear for the girl's safety. That was our utmost concern." *Id.* at 40.

6. Agent Florvil testified that he accompanied Agent Morris throughout the apartment and that in the bedroom Agent Morris "turned to [him] and told [him] that we're going to leave." Tr. at 69. Agent Morris, however, did not testify that he was followed by Agent Florvil or that any conversations took place.

could search the apartment. *See id.* at 21. You gave them permission and Agent Morris "immediately asked them again ... [a]re you sure it's okay [if] we search the apartment" and informed You that he did not have to let them in. *Id.* at 22. Agent Morris also informed him that if the agents found anything they were "going to take it" so he wanted to be sure that You understood. *Id.* at 22. *See also id.* at 62. You again gave them permission. *See id.* at 22, 62. He appeared to Agent Morris to be "calm" and "lucid." *Id.* After searching the apartment for fifteen minutes, the agents gave You's wife a list of the seized items and asked You if he would be willing to go down to the INS office with the agents. *See id.* at 23–24, 62–63. Although You agreed to go with the agents to the office, he was placed under arrest and handcuffed once they were outside. *See id.* at 24.

### B. Findings of Fact

Based on my review of the entire record, I make the following findings of fact.[7] The

agents and informant followed You into the elevator. When all four men exited onto the second floor, the informant and Agent Florvil found a stairwell. The informant then left the building. Agent Florvil stayed inside the stairwell until he heard You confront Agent Morris in the hallway by saying "What problem?" When Agent Morris responded that "there was no problem," You hurried to his door, which was already wedged open as it was a warm day. *See id.* at 17, 69. Agents Morris and Florvil quickly followed him.

You was frightened and he reasonably believed that the strangers in his hallway may have been attempting to rob or otherwise harm him and the other occupants in his home. *See* Def. Aff. ¶¶ 8–9. You attempted to close the door to his apartment, but Agent Morris put his foot between the door and the door frame and then forced the door open.[8] Agents Morris and Florvil then entered the apartment. You never invited or welcomed the agents inside his

7. At times, the testimony of Agent Morris lacked credibility. A couple of examples suffice. In certain key respects, his testimony did not comport with common sense. For example, it is undisputed that when You confronted the agents in the hallway Agent Morris responded that there was "no problem" but he did not identify himself as a federal agent and he was wearing plain clothes. *See* Tr. at 22. One would expect a person who is followed by a stranger into the hallway outside his home to be perturbed, if not frightened. Yet, Agent Morris claims that You was calm enough to enter his apartment and leave the door open with his pregnant wife inside. Agent Morris also repeatedly testified that he "didn't think about searching the apartment until [he] was already in the apartment the second time." *Id.* at 39. *See also id.* at 26, 42–43. However, the fact that Agent Morris and five other agents came to the apartment and immediately "proceeded to the back bedroom and began to search" upon receiving You's consent, *id.* at 23, indicates that the agents had planned the search prior to entering the apartment.

Agent Morris's testimony was also inconsistent. For example, Agent Morris stated that he first left the apartment "[b]ecause *no one* could understand me." *Id.* at 19 (emphasis added). This is inconsistent with his testimony that, prior to the arrival of the translator, Agent Morris asked if he could have identification from one woman who "said yes and walked back into the bedroom area to get it" and then produced a New York state drivers license. *Id.* at 18. *See also id.* at 69. Agent Morris also showed no hesitation in describing the occupants of the apartment as "[c]alm," *id.* at 20, but when he was asked whether the defendant "appeared to be confused" or "furtive" or "nervous," Agent Morris responded that he "wouldn't know" and "couldn't say," *id.* at 46–47.

8. In making this determination, I acknowledge that courts "give greater weight to [witness] testimony, which was subject to cross examination, than to [sworn] affidavits." *United States v. Gardner,* 611 F.2d 770, 774 n. 2 (9th Cir.1980). *See also United States v. Frank,* 8 F.Supp.2d 284, 291 n. 2 (S.D.N.Y.

home. Agent Morris then told You that he was a federal agent and showed him a badge, but it was clear to the agents that neither man understood him. A young Chinese woman emerged from the bedroom and told the agents that neither of the men spoke English. Agents Morris and Florvil asked the woman for some identification and followed her into the bedroom as she retrieved her New York State Driver's license. Once inside the bedroom, the agents realized that the woman asleep on the bed was the illegal alien who they had seen with You earlier that morning.[9] At this point, Agents Morris and Florvil planned to obtain consent from You in order to search the apartment for incriminating evidence, especially the bedroom.[10]

Agents Morris and Florvil then left the bedroom, ordered You to keep the door open and went back into the hallway.[11] Because he was frightened and confused, You complied with the agents' order to keep his door open.[12] Agent Morris called another agent at the office to ask for an interpreter as well as the assistance of other agents in order to conduct a search of the apartment. After approximately thirty minutes, the interpreter and four agents arrived at the apartment. Through the interpreter, Agent Morris asked You if they could search the apartment. You gave his permission but only because he did not believe he could refuse. You was overwhelmed by the earlier events as well as the presence of six federal agents in his apartment. The agents immediately began their search in the bedroom. After searching the apartment for approximately fifteen minutes, the agents seized several items and asked You if he would be willing to go down to their office with them. You agreed and, once outside, he was arrested.

## IV. DISCUSSION

### A. The Fourth Amendment's Warrant Requirement

"[T]he protection afforded by the Fourth Amendment's warrant requirement against official entry into private homes without prior approval by a neutral magistrate was among the significant goals of our forefathers' fight for independence more than 200 years ago." *Lavan*, 10 F.Supp.2d at 384. This is because "[a]t the core of the Fourth Amendment, whether in the context of a search or an arrest, is the fundamental concept that any governmental intrusion into an individual's home ... must be strictly circumscribed." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

---

1998) (crediting the testimony of witnesses over the allegations in an affidavit because the affidavit was not subject to cross-examination and the court found the testifying witnesses fully credible). However, even after affording the agents' testimony greater weight because it was subject to cross-examination, I do not find their testimony on this point to be credible. The remainder of my findings of fact are based on the agents' own testimony and common-sense inferences that are drawn from the agents' descriptions of the events. *See infra* notes 9–12.

9. It is reasonable to conclude that the agents recognized the illegal alien when they first entered the bedroom because they had seen her earlier in the day with You. *See* Tr. at 40; *see also supra* note 5.

10. I conclude that the agents did not spontaneously decide to search the apartment after four additional agents and an interpreter arrived at the apartment. *See supra* note 7.

11. This finding is based as much on common sense as on You's affidavit. *See supra* note 7.

12. While the agents claim that the occupants appeared calm, this testimony cannot contradict You's *subjective* claim that he felt frightened or my determination that a reasonable person in his situation would have experienced fear.

Indeed, "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed [and courts] have long adhered to the view that the warrant procedure minimizes the danger of needless intrusions of that sort." *Id.* (quotation marks and citation omitted). Thus, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* (citation omitted). *See also United States v. Karo*, 468 U.S. 705, 714–15, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (same); *Anobile*, 274 F.3d at 58 ("Privacy expectations are high in homes .... [and] homes receive the highest Fourth Amendment protections."). "With few exceptions, the question whether a warrantless [arrest or search inside] a home is reasonable and hence constitutional must be answered no."[13] *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 2042, 150 L.Ed.2d 94 (2001).

■■■ There are two exceptions to this strict prohibition of entering a person's home without a warrant: exigent circumstances or consent.[14] *See Steagald v. United States*, 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) ("[A]bsent exigent circumstances or consent, an entry into a private dwelling to conduct a search or effect an arrest is unreasonable without a warrant."). Although only an exception, obtaining consent to enter a home is an appealing alternative, in the opinion of some commentators, to securing a warrant and therefore "frequently relied upon" by law enforcement officials. 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.1 (3d ed. 1996) ("LaFave, *Search and Seizure*"). Professor LaFave has argued that this is true even when probable cause is present because the police believe the "warrant procedure is overly technical and time-consuming and that it has no corresponding advantages for them or meaningful protections for the individual." *Id.* "[C]onsent will often appear to be an attractive alternative as a matter of administrative convenience, especially when the police would have to travel a considerable distance to obtain a warrant." *Id.* In other words, even when the police know they have probable cause to secure a warrant to arrest an individual or search a premise, they sometimes find the process of obtaining a warrant too burdensome, time-consuming or limiting.[15]

■■■ The Supreme Court, however, has long emphasized that administrative inconvenience does not justify giving short shrift to the Fourth Amendment's warrant

13. At times, the Supreme Court has spoken about the sanctity of the home in even stronger terms. *See Agnello v. United States*, 269 U.S. 20, 32, 46 S.Ct. 4, 70 L.Ed. 145 (1925) ("The search of a private dwelling without a warrant is *in itself* unreasonable and abhorrent to our laws." (emphasis added)); *Frank v. Maryland*, 359 U.S. 360, 380, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959) ("We have emphasized over and again that a search without a warrant can be made only in *exceptional circumstances*. If a house is on fire or if the police see a fugitive enter a building, entry without a search warrant can of course be made. Yet absent such extraordinary situations, the right of privacy must yield only when a judicial officer issues a warrant for a search on a showing of probable cause." (emphasis added)).

14. If the police are lawfully inside the home, they may also seize any contraband discovered during a "protective sweep," *see Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), or in plain view, *see Washington v. Chrisman*, 455 U.S. 1, 5–9, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982).

15. A consent search also has an "added benefit" from the police perspective because "the search pursuant to consent may often be of a somewhat broader scope than would be possible under a search warrant." LaFave, *Search and Seizure* § 8.1.

requirement, especially when the police seek to enter a person's home. "We are not dealing with formalities. The presence of a [search or arrest] warrant serves a high function." *McDonald v. United States*, 335 U.S. 451, 455, 69 S.Ct. 191, 93 L.Ed. 153 (1948). The warrant requirement "is, or should be, an important working part of our machinery of government, operating as a matter of course to check the well-intentioned but mistakenly overzealous, executive officers who are a part of any system of law enforcement." *Coolidge v. New Hampshire*, 403 U.S. 443, 481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

It is important to remember that nefarious motives need not be ascribed to those who protect and serve our society in order to understand why the founders believed the warrant requirement was so important. It is not the job of the police to take a neutral and detached position with respect to invading a person's privacy in order to apprehend a criminal. Rather, the police are "engaged in the often competitive enterprise of ferreting out crime" and we have given them the power and encouragement to pursue those who violate our laws. *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). "Zeal in tracking down crime," however, "is not in itself an assurance of soberness of judgment." *McNabb v. United States*, 318 U.S. 332, 343, 63 S.Ct. 608, 87 L.Ed. 819 (1943). "Power is a heady thing . . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home." *McDonald*, 335 U.S. at 456, 69 S.Ct. 191.

 Given Professor LaFave's analysis of why the police often choose to rely on obtaining a person's consent to enter his home rather than obtaining a warrant, it is also worth emphasizing the value that a warrant provides *to the police*. If a warrant is relied upon in good faith, courts will not suppress evidence that is obtained during a subsequent search or seizure even if that warrant is later found to be defective. *See United States v. Leon*, 468 U.S. 897, 919–20, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). " '[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law,' " and courts will not penalize law enforcement officers for the magistrate's error. *Id.* at 921, 104 S.Ct. 3405 (quoting *Stone v. Powell*, 428 U.S. 465, 498, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (Burger, C.J., concurring)). Thus, if the police have an arrest or search warrant, they do not have to worry about overcoming the presumption of unreasonableness that attaches to all warrantless entries into a home and they avoid having their actions generally scrutinized *ex ante* by a court.

## B. The Agents Unlawfully Arrested the Occupants of the Apartment

 The ultimate decision of whether to seek a warrant or consent rests with the police, but this case amply illustrates the wisdom of our Fourth Amendment jurisprudence that has long encouraged law enforcement officers to consider obtaining a warrant "whenever practicable."[16] *Terry*, 392 U.S. at 20, 88 S.Ct.

**16.** Indeed, the concern about law enforcement officers relying too heavily on consent in the context of searching a home is not a new one. *See, e.g., United States v. Arrington*, 215 F.2d 630, 637 (7th Cir.1954) ("It is high time that courts place their stamp of disapproval upon this increasing practice of federal officers searching a home without a warrant on the theory of consent, particularly where no reason is shown why a search warrant was not obtained."); *Catalanotte v. United States*, 208 F.2d 264, 268 (6th Cir.1953) ("We have noted with disapproval the growing tendency on the part of police officers to be very quick on the trigger in construing—and acting upon their construction—a statement of some

1868. When You attempted to shut the door because he believed that he was going to be robbed or otherwise harmed, the agents forced it open and unlawfully entered his home without permission. The officers then identified themselves as federal agents and demanded to see everyone's identification. Such actions plainly constitute a seizure of You because an objective person in You's position would not feel at liberty "to ignore the police presence and go about his business." *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)). *See also Glover,* 957 F.2d at 1008 (holding that in determining whether a seizure has occurred "a court must consider if, in view of all of the circumstances surrounding the encounter, a reasonable person would have believed that he or she was not free to leave") (quotation marks, citations, and alterations omitted). Although the agents had probable cause to believe You committed a felony after having seen him transport an illegal alien earlier in the day, the agents had no right to forcibly enter his home and arrest him without a warrant. *See Payton,* 445 U.S. at 583–603, 100 S.Ct. 1371 (holding that, in the absence of exigent circumstances, the police may not enter a private residence to make a routine arrest).[17] Moreover, the order that the door remain open so that the agents could observe the movement of the occupants constituted a *de facto* arrest because the decision by You and the other occupants to comply and remain inside the apartment was not "freely and voluntarily given" but simply an "acquiescence to a claim of lawful authority." *Bumper,* 391 U.S. at 548–49, 88 S.Ct. 1788. Because this arrest took place inside You's home and without a warrant, it was unlawful.

## C. The Unlawful Arrest Tainted You's Consent

"[C]onsent to search, like a confession, may be tainted by the illegal arrest and [thus become] invalid and suppressible." *United States v. Patzer,* 277 F.3d 1080, 1084 (9th Cir.2002). *See also Florida v. Royer,* 460 U.S. 491, 507–08, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (holding that because the individual "was being illegally detained when he consented to the search of his luggage that ... consent was tainted by the illegality"). Here, any consent that You may have given was tainted because there was no break in the causal chain between the illegal arrest and the consent that would allow the introduction of the seized evidence at trial. *See United States v. Ceballos,* 812 F.2d 42, 50 (2d Cir.1987). No *Miranda* warnings were given, the consent was given during the unlawful detention, there were no other

---

known offender as an invitation to search his premises.").

17. In contrast, the police may constitutionally arrest an individual in a public place (*e.g.,* outside) without a warrant if they have probable cause. *See United States v. Watson,* 423 U.S. 411, 417–24, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). "What distinguishes these two cases is that the latter involves an entry (*i.e.,* a search) into the home, a place where individuals enjoy an especially heightened Fourth Amendment protection." *Sparing v. Village of Olympia Fields,* 266 F.3d 684, 688–89 (7th Cir.2001). For example, the Second Circuit has stated that "[b]reaking the threshold of the doorway trigger[s] the warrant requirement." *United States v. Gori,* 230 F.3d 44, 52 n. 3 (2d Cir.2000) (citing *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)). Nonetheless, the police may order a person to evacuate a house through a door "voluntarily opened by an occupant in response to a knock by someone invited by an occupant" so long as the police do not go inside. *Gori,* 230 F.3d at 54. In this case, the warrant requirement clearly applies because the agents broke the threshold of You's doorway upon entering his home without permission.

intervening events, and "[t]he illegality ... had a quality of purposefulness." *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *See also United States v. Oguns*, 921 F.2d 442, 447–48 (2d Cir.1990) (describing factors to consider in determining whether consent was tainted); *Ceballos*, 812 F.2d at 50 (same); *Patzer*, 277 F.3d at 1084 (same).

### D. You's Consent Was Involuntary

■ Even assuming, *arguendo*, that the arrest was not unlawful, any consent given by You was nonetheless involuntary. In determine whether consent was freely given, "it is appropriate to consider the particularities of the situation that is presented in any given case and the possibly vulnerable subjective state of the person who consents." *Lavan*, 10 F.Supp.2d at 384 (quotation marks and citations omitted). Other relevant factors include:

> whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent.

*Id.* (citations omitted).

In this case, several factors show that You's consent was the product of duress or coercion. The situation first became coercive when the agents followed You down the hallway and he had a reasonable belief that he might be harmed by two strangers. *See United States v. Perez*, 198 F.Supp.2d 406 (S.D.N.Y. 2002) (stating that a reasonable person "generally finds it far more comforting to be confronted by a law enforcement officer than a complete stranger .... [and] the failure of the police to identify themselves makes the situation more coercive, not less"). You was also in a particularly vulnerable state of mind be-cause his nine-month pregnant wife, who the officers had seen earlier in the day, was inside the apartment. Once these strangers identified themselves as federal agents, they kept everyone in the two-room apartment for half an hour while waiting for four more agents and an interpreter to arrive. You was clearly in custody during these thirty minutes. *See supra* Part IV.A. In addition, the fact that the police pushed the door open as You tried to shut it constituted a show of force. Finally, when You gave his permission to conduct a search, he was facing six agents who were either standing inside his apartment or outside in the hallway. Under such conditions, the officers lacked any reasonable basis to believe that You's consent was not the product of implied duress or coercion. *See Garcia*, 56 F.3d at 423. You's consent to the search was anything but "the product of an essentially free and unconstrained choice." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041.

### V. CONCLUSION

The arrest of You and subsequent search of his home is precisely the type of "mistakenly over-zealous" conduct of which courts have repeatedly warned. *Coolidge*, 403 U.S. at 481, 91 S.Ct. 2022. I have no doubt that these agents were well-intentioned in apprehending those who smuggle illegal aliens into this country as well as in protecting the young woman who had been separated from her relatives. *See* Tr. at 40. But it was reasonably practicable here for the agents to obtain an arrest warrant and the officers erred by not giving that option more consideration. Because the agents had probable cause to believe that You had committed a felony, obtaining an arrest warrant would have been relatively easy. The agents also had informants surveying You's movements, so there was no

fear that You might escape. Given that the agents had followed him throughout the day, there was obviously no pressing need to arrest You at that moment. But, instead of securing a warrant, the agents forcibly entered his home to effectuate an arrest and then decided to conduct a search—these actions are unconstitutional and require suppression of any evidence that was seized.

For the reasons set forth above, the motion to suppress is therefore granted.

SO ORDERED: