**UNITED STATES of America**

**v.**

**Anabel PEREZ, Defendant.**

**No. 00 CR 257(SAS).**

United States District Court,
S.D. New York.

Feb. 28, 2002.

David M. Siegal, Assistant United States Attorney, United States Attorney's Office, Southern District of New York, New York City, for the Government.

Louis R. Aidala, New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

In March 2000, three law enforcement agents followed Anabel Perez into an elevator and asked him if they could look inside a large plastic cooler that he had placed by his feet. When Perez gave them permission, an agent opened the cooler and "found over twenty-six brick-shaped objects wrapped in a combination of cellophane and/or tape." Complaint ¶ 4. "The officers asked Perez what the objects were, and Perez said [the bricks were] narcotics." *Id.* Perez was immediately placed under arrest and subsequently charged with possession of more than five

kilograms of cocaine with intent to distribute. *See id.* (citing 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 841(b)(1)(A)).

Perez has moved pursuant to Federal Rule of Criminal Procedure 12(b)(3) to suppress all physical evidence found and all statements that he made as a result of the encounter on the grounds that (1) he was unlawfully detained and (2) his consent was involuntary. *See* 9/29/00 Notice of Motion; 9/29/00 Affirmation of Louis R. Aidala, Defendant's Attorney, in Support of Motion to Suppress ("Def. Aff."). An evidentiary hearing was held on November 6, 2001, and oral argument was heard on December 10, 2001. For the reasons below, the motion to suppress is denied.

## I. LEGAL STANDARD

### A. Seizure of a Suspect

■ The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...." U.S. Const. amend. IV. "As our [Fourth Amendment] cases make clear, there are three levels of interaction between agents of the government and private citizens" with each level requiring a different degree of justification. *United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir. 1995). *First,* the police may initiate a voluntary encounter with an individual and ask questions as long as the person is willing to listen. *See Brown v. City of Oneonta,* 221 F.3d 329, 340 (2d Cir.2000). Such an encounter does not constitute a seizure and therefore does not require any justification nor "trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). *Second,* the police may briefly detain a person as part of an investigation if

they have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). *Third,* the police may arrest an individual if they have probable cause to believe that he has committed a felony or a criminal offense in the police's presence. *See Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 1557–58, 149 L.Ed.2d 549 (2001). A consensual encounter ripens into a seizure, whether an investigative detention or an arrest, when a reasonable person under all the circumstances would believe he was not free to walk away or otherwise ignore the police's presence. *See United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir.1992). "The test is an objective one based on how a reasonable innocent person would view the encounter." *Id.* (citations omitted).

### B. Search of a Suspect or His Property

The Fourth Amendment also "generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson,* 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (per curiam). Warrantless searches "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bus-*

*tamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *See also Anobile v. Pelligrino,* 274 F.3d 45, 61 (2d Cir.2001).

### C. Burden of Proof

■ Once a defendant establishes a basis for a suppression motion, the government must prove that the search was proper by a preponderance of the evidence. *See also United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Matlock,* 415 U.S. 164, 177 n.14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Calvente,* 722 F.2d 1019, 1023 (2d Cir.1983).

## II. UNCONTESTED FACTS

On March 1, 2000, five agents from the Drug Enforcement Agency ("DEA"), New York State Police and New York City Police Department were observing a building located at 2545 Sedgwick Avenue in the Bronx, New York. *See* 11/6/01 Transcript ("Tr.") at 26, 129–30; 3/3/00 DEA Report of Investigation. Based on past experience, the agents had concluded that a high level of drug trafficking centered around the building and that drugs were stored in different apartments inside the building. *See* Tr. at 26, 130, 158–59. Since November 1998, the agents had arrested between four to six people in the building; they had also seized multiple kilograms of cocaine and more than a kilogram of heroin. *See id.* at 21, 26.

Around two o'clock in the afternoon, Special Agent Timothy Plancon was positioned across the street from the building when he observed a man slowly drive a dark-colored Lexus in front of its entrance.[1] *See id.* at 22–23, 28–29. The

---

**1.** Agent Plancon testified that his observation post was in the third floor of a building on a hill, *see* Tr. at 100, so it "would be the equiva-

lent of the sixth story overlooking the front of the [other] building," *id.* at 23.

driver would later be identified as the defendant, Anabel Perez. *See* Complaint ¶ 2. A few minutes later, when Agent Plancon watched Perez drive by the building's entrance from the opposite direction, he made a comment about the car to Agent Kevin O'Grady who was also in the observation post. *See* Tr. at 26, 29. Shortly thereafter, the agents saw Perez drive by the building for a third time. *See id.* at 29–30. Perez then pulled over to the curb about 100 feet from the entrance. *See id.* After sitting in the car for a few minutes talking on a cell phone, Perez got out of the car and walked around to the front of the car while looking up and down the street in a surveillance-conscious manner. *See id.* at 30–31. Agent O'Grady described these events to the other agents by radio. *See id.* at 31–32, 132–33, 177.

Perez opened the trunk of the car and removed a large red and white plastic container (*i.e.*, a Rubbermaid cooler). *See id.* at 32–33. The top of the cooler was taped closed and Perez appeared to have difficulty lifting it. *See id.* at 33, 136. After placing the cooler on the sidewalk, Perez removed a suitcase from the back seat of the car and placed it in the trunk. *See id.* at 32. Perez then picked up the cooler and began walking towards the entrance of the building. *See id.* Perez continued to look up and down the street. *See id.* At this point, Agent Plancon described Perez's appearance to the other agents and

told them that Perez was heading towards the building's entrance. *See id.*

At the same time, Sergeant Michael Murphy parked an unmarked car in front of the building.[2] *See id.* at 32, 131, 134. Approximately thirty seconds later, two other agents parked another unmarked vehicle in front of the building. *See id.* at 177. All of the agents were dressed in plain clothes (*e.g.*, jeans, denim shirt). *See id.* at 27, 131, 177. Sergeant Murphy got out of his car and looked down the sidewalk towards Perez. *See id.* at 32–33, 134. Perez then "stopped and was looking at Sergeant Murphy and set the container down." *Id.* at 33. *See also id.* at 134. "He appeared to look very nervous and he wiped his brow and a short time later picked the container back up and continued walking towards the front doors [of the building]." *Id. See also id.* at 134.

When Perez approached the building's entrance, Sergeant Murphy held open the outer door of the vestibule for him. *See* Def. Aff. at 1; *see also* Tr. at 34, 134–35, 178. Perez said "thank you." *Id.* at 135. "As [Perez] opened the inner door with [his] key, two more officers entered the vestibule."[3] Def. Aff. at 1. Perez entered the lobby of the building followed by Sergeant Murphy and the two other two agents. *See id.; see also* Tr. at 35, 137. Although the agents never identified themselves, it was reasonably clear to Perez that they were law enforcement officers. *See infra* Part IV. The agents and Perez

2. Sergeant Murphy had been stationed about two blocks north of the building when Agent Plancon first noticed Perez. *See* Tr. at 131. Agent Plancon notified the agents to move closer when Perez took the cooler out of the trunk. *See id.* at 31–32, 133, 177.

3. Although the parties have not raised the issue, there is some disagreement in the record about who opened the inner door of the vestibule. *Compare* Def. Aff. at 1 (Perez stating, "As I opened the inner door with my key

. . . ."); Complaint ¶ 4 ("Three law enforcement officers followed Perez, who had a key, into the building.") *with* Tr. at 136 (Sergeant Murphy testifying on direct examination that "I opened the, inside it's a locked door and I opened it with a key that I had previously gotten and we went inside to the lobby"); Tr. at 35 (Agent Plancon testifying "[Sergeant Murphy] was inside that vestibule also and held the door for the defendant a second time . . . .").

walked across the lobby towards the elevator, and Sergeant Murphy asked Perez "if he had gone fishing." Tr. at 138. *See also id.* at 181; Def. Aff. at 1. Perez "replied one word, he said yes." Tr. at 138.

Perez entered the elevator with Sergeant Murphy and the other two agents behind him. *See id.* at 139. As the agents walked into the elevator, Perez faced out towards the lobby and placed the cooler down on the floor next to him. *See id.* Facing towards Perez and the back of the elevator, Sergeant Murphy told Perez that "I'm a fisherman, too," and asked Perez if he "could see the fish." *Id.* at 181. Perez responded, "go ahead." *Id. See also id.* at 184. Sergeant Murphy lifted the cover off of the cooler and the agents found what appeared to be, based on their experience, kilograms of cocaine packaged into bricks.[4] *See id.* at 140, 164, 182, 188. Sergeant Murphy asked Perez about the bricks, and Perez told him they were made of drugs. *See* Complaint ¶ 4. The agents then handcuffed Perez and placed him under arrest. *See* Tr. at 45, 142. It would later be determined that the cooler contained approximately twenty-six kilograms of cocaine. *See* 3/30/00 DEA Laboratory Report. The entire encounter between the agents and Perez lasted less than four minutes.[5]

**III. CONTESTED FACTS**

The above facts are uncontested in all aspects but one: The defendant and the government disagree about whether the DEA agents expressly identified themselves before asking to search the cooler. Defendant's counsel claims that "the officers identified themselves as law enforcement agents before asking the defendant to look inside the container . . . ." 12/14/01 Letter from Louis Aidala, Defendant's Counsel, to this Court at 1. This conclusion is based on the Complaint, which states that "[o]nce in the lobby, the officers identified themselves as law enforcement officers," Complaint ¶ 4, and Agent Plancon's understanding of the events that transpired, *see* Tr. at 109, 115, 185. However, Agent Plancon was not present when Perez gave his consent and Perez's affidavit does not clearly state whether the officers identified themselves before or after the discovery of the cocaine.[6] *See* Def. Aff. at 1.

At the suppression hearing, Sergeant Murphy and another agent who approached Perez in the elevator testified that they did not identify themselves until after they arrested Perez. *See* Tr. at 147, 163, 166, 185. Their testimony was fully credible and consistent with the other evidence presented in the case. I therefore

---

4. The Complaint, which was prepared by Agent Plancon, states that "Perez opened the container . . . ." Complaint ¶ 4.

5. A videotape of the events, which the agents recorded from the observation post across the street, shows that the two agents entered the vestibule at 2:09 p.m. *See* Tr. at 42. Sergeant Murphy reappeared outside "about 11 and a half minutes after 2 p.m." *Id.* at 43. *See also id.* at 36 (Agent Plancon testifying that he waited "two, three, four minutes" from the time the agents entered the building to when they came back outside); *id.* at 89 ("From the time they entered the building originally until

I got the call, I think it was like two or three minutes").

6. Defendant's Affidavit states: "I removed a plastic cooler from the vehicle and carried it to the entrance to the above mentioned building, where a man, who *soon thereafter* identified himself as a law enforcement officer, held the outer door open for me . . . ." Def. Aff. at 1 (emphasis added). Given the short timespan of the encounter (*i.e.,* less than four minutes), the affidavit does not help resolve whether the officers identified themselves before or after discovering the cocaine.

conclude that they did not identify themselves prior to the search.[7]

Nonetheless, I also conclude that a reasonable person in Perez's situation would have known that the men were law enforcement officers and that Perez, in fact, believed that the three men were officers. As the government pointed out during oral argument, "the defendant may have concluded they were officers simply by dint of the fact that they were tall and white and in the neighborhood."[8] *Id. See also id.* at 10, 33. Not only did the officers seem out of place in the neighborhood, but the coordinated fashion in which they parked their cars and arrived at the entrance would lead a reasonable person in Perez's situation to believe that they were officers who had been observing the building.

The government has argued that because the officers did not expressly identify themselves as officers "if anything ... [this] makes the situation even less coercive." *Id.* at 7. This argument, however, cuts both ways. On the one hand, Perez may have been more intimidated by an officer than a lay person. On the other hand, "a reasonable innocent person" often finds it far more comforting to be confronted by a law enforcement officer than a complete stranger. *Glover*, 957 F.2d at 1008. A reasonable person can generally assume that the officer is serving the public's interest and will act within the law;

such assumptions do not apply to a stranger whose motive cannot be ascertained. Thus, in some situations, the failure of the police to identify themselves makes the situation more coercive, not less.

## IV. DISCUSSION

### A. Perez Was Not Seized

A consensual encounter "may be initiated by the police without any objective level of suspicion and does not, without more, amount to a 'seizure' implicating the Fourth Amendment's protections." *Glover*, 957 F.2d at 1008. In this case, the only fact that supports Perez's contention that he was seized prior to the agents' discovery of the cocaine is that the agents followed him into the elevator and, in those close quarters, asked to look in the cooler. Although the physical location of the questioning should be considered when evaluating whether an encounter constitutes a seizure, *see Bostick*, 501 U.S. at 435, 111 S.Ct. 2382, the Supreme Court has made it clear that the police do not seize an individual by asking questions of an individual in "cramped confines."[9] *Id.*

A review of the circumstances surrounding the encounter shows that "a reasonable person would [still] feel free to disregard the police." *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382 (quotation marks and

---

7. The Complaint, which was not prepared by officers who had first-hand knowledge of the events inside the building, was simply incorrect. *See* 12/10/01 Transcript ("Oral Arg.") at 36, 38.

8. Agent Plancon testified that Sergeant Murphy "is probably 6 feet, 6 feet 1 and 200 pounds, 205 pounds." Tr. at 68. The other two agents were "6'2", 230 pounds" and "6 foot to 6'1, 190 to 195 pounds." *Id.*

9. In his moving papers, defendant mostly argues that the agents lacked "reasonable suspi-

cion to justify his being stopped and questioned by police. His seizure by police was therefore illegal." Def. Aff. at 3. The defendant errs by assuming that he was seized. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry*, 392 U.S. at 19 n.16. Because I find that the defendant was not seized prior to the discovery of the drugs, the government does not need to offer any justification for its questioning. *See Tehrani*, 49 F.3d at 58.

citation omitted).[10] The agents did not physically touch Perez or prevent him from going anywhere. See Tr. at 143, 180. The agents did not brandish any weapons or posture towards Perez in a threatening manner. The encounter was casual and polite in nature: The agents made no demands of Perez and nothing in the tone of Sergeant Murphy's voice indicated that compliance with his request was required. See id. at 135, 143. In sum, the police did nothing more than ask Perez one question in the lobby and one question inside the elevator in a casual and relaxed manner. A reasonable person viewing the encounter would believe that Perez was at liberty "to ignore the police presence and go about his business." Bostick, 501 U.S. at 437, 111 S.Ct. 2382 (quoting Michigan v. Chesternut, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)). See also Glover, 957 F.2d at 1008.

## B. Perez's Consent Was Voluntary

"[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227, 93 S.Ct. 2041. See also Mendenhall, 446 U.S. at 557, 100 S.Ct. 1870. "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" United States v. Garcia, 56 F.3d 418, 423 (2d Cir.1995) (citing United States v. Sanchez, 32 F.3d 1330, 1334–35 (8th Cir.1994)). See also United States v. Lavan, 10 F.Supp.2d 377, 384 (S.D.N.Y.1998). "Recent Su-

preme Court decisions emphasize . . . that the issue of reasonableness is to be measured by an objective standard." Garcia, 56 F.3d at 423. When determining "objective reasonableness," the court asks: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (quoting Illinois v. Rodriguez, 497 U.S. 177, 183–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)).

"Of course, this objective standard does not preclude an assessment of the particularities of the situation that [are] presented in any given case. On the contrary, it is still the totality of the circumstances that must be considered." Garcia, 56 F.3d at 423. Thus, "[i]n applying this test, it is appropriate to consider the particularities of the situation that [are] presented in any given case and the possibly vulnerable subjective state of the person who consents." Lavan, 10 F.Supp.2d at 384 (quotation marks and citations omitted). Other relevant factors include:

whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent.

Id. (citations omitted). Finally, "knowledge of the right to refuse consent is not a requirement to a finding of voluntariness, although it may be a factor in ascertaining whether the consent was coerced." Gar-

---

**10.** The Second Circuit has instructed lower courts to consider, among other things, the following factors when determining whether an individual was seized:

[T]he threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; lan-

guage or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room. Glover, 957 F.2d at 1008.

*cia,* 56 F.3d at 423 (citations omitted). "This is so because the Fourth Amendment prohibits not all searches and seizures, but only those that are 'unreasonable.'" *Id.* (citing *Rodriguez,* 497 U.S. at 183, 110 S.Ct. 2793).

While Perez claims that his consent to search the cooler was the product of coercion, he points to only two facts to support this contention. The first is that the police questioned him in an elevator. Although this does make the encounter more intimidating, the Supreme Court has held that being questioned in a confined space does not vitiate an individual's consent. *See Bostick,* 501 U.S. at 439, 111 S.Ct. 2382.

For example, in *Bostick,* two visibly-armed officers boarded a bus and, after eyeing the passengers, approached Terrance Bostick at the back of the bus. *See id.* at 431, 111 S.Ct. 2382. Standing above Bostick and blocking the aisle, the officers asked for his identification and bus ticket. After Bostick complied, the officers informed him that they were "narcotics agents on the lookout for illegal drugs" and asked for Bostick's consent to search his luggage, which Bostick gave. *Id.* at 431–32, 111 S.Ct. 2382. Upon examining two of Bostick's bags, the officers found cocaine and arrested him. *See id.*

Bostick moved to suppress the cocaine on the ground that the encounter constituted a seizure "because it took place in the cramped confines of a bus." *Id.* at 435, 111 S.Ct. 2382. "A police encounter is much more intimidating in this setting, he argue[d], because police tower over a seated passenger and there is little room to move around." *Id.* In rejecting this contention, the Supreme Court held that "Bostick's movements were 'confined' in a sense, but this was the natural result of his decision to take the bus; it says *nothing*

about whether or not the police conduct at issue was coercive." *Id.* (emphasis added). Although the Supreme Court refrained from deciding whether Bostick's consent was voluntary, the Court found it significant that "the officers did not point guns at Bostick or otherwise threaten him and that they specifically advised Bostick that he could refuse consent." *Id.* at 437, 111 S.Ct. 2382.[11]

Here, Perez's situation was less intimidating than the one that Bostick faced. *First,* while *Bostick* involved visibly-armed officers confronting the defendant, the agents who confronted Perez did not brandish any weapons. *See* Tr. at 135–36, 143, 179. *Second,* while one of the officers in *Bostick* stood directly above the defendant while he was sitting in his seat, Perez was not towered over by an officer. *Third,* the encounter in *Bostick* involved more extensive questioning than the two casual questions that Perez was asked.

█ The second fact supporting Perez's argument is that, unlike *Bostick,* the agents failed to inform Perez that he had a right to ignore their presence or otherwise refuse to cooperate. *See* Def. Aff. at 1. The Supreme Court, however, has held that the police need not inform individuals of their rights before initiating a voluntary encounter. *See Ohio v. Robinette,* 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Schneckloth,* 412 U.S. at 231–32, 93 S.Ct. 2041. "This is so because the Fourth Amendment prohibits not all searches and seizures, but only those that are 'unreasonable'," *Garcia,* 56 F.3d at 422, and government agents need not inform an individual about all of his rights before asking him questions, *see Schneckloth,* 412 U.S. at 231–32, 93 S.Ct. 2041. "[I]t would be thoroughly impractical to

11. On remand, the Florida Supreme Court found the encounter in Bostick to be consensual. *See Bostick v. State,* 593 So.2d 494, 495 (Fla.1992) (per curiam).

impose on the normal consent search the detailed requirements of an effective warning." *Id.* "The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning." *Id.* Moreover, Perez does not claim that he did not know he was at liberty to ignore the police and refuse their request—he only alleges that the police did not inform him of these rights. *See* Def. Aff. at 1. Yet, even "knowledge of the right to refuse consent is not a requirement to a finding of voluntariness, although it may be a factor in ascertaining whether the consent was coerced." *Garcia,* 56 F.3d at 422–23.

Finally, Perez argues that his consent was invalid because he believed that he had "no choice." Def. Aff. at 1. Defendant maintains that "[c]ommon sense and ordinary human experience dictate that no rational person who is knowingly carrying 26 kilograms of cocaine would willingly consent to a [search]." 12/14/01 Letter from Louis Aidala to this Court at 3. *See also* Oral Arg. at 18. As the Supreme Court stated when it rejected this same argument more than a decade ago: "This argument cannot prevail because the 'reasonable person' test presupposes an *innocent* person." *Bostick,* 501 U.S. at 438, 111 S.Ct. 2382 (emphasis in original). "The test is an objective one based on how a reasonable innocent person would view the encounter." *Glover,* 957 F.2d at 1008 (citations omitted). *See also Garcia,* 56 F.3d at 423; *United States v. Springer,* 946 F.2d 1012, 1016 (2d Cir.1991).

■ The uncontested evidence shows that the encounter between the officers was casual and very brief. Perez was not in a vulnerable state of mind, he was not in custody, *see* supra Part V.A., there was no show of force by the agents, and Perez had not previously refused consent or otherwise indicated that he did not wish

to speak with the police. Although questioning an individual in an elevator without informing him of his rights does make an encounter with the police appear somewhat more coercive, when viewing the totality of the circumstances from the perspective of an objectively reasonable innocent person, Perez's consent was not the product of duress or an "acquiescence to a claim of lawful authority" but rather "freely and voluntarily given." *Bumper,* 391 U.S. at 548–49, 88 S.Ct. 1788.

## C. Additional Arguments Raised During Oral Argument

Perez makes three additional arguments. *First,* he argues that the warnings that the agents gave him after he was arrested, pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were inadequate. *See* Oral Arg. Tr. at 27 (arguing that "the form that was used is inherently defective"). The agents read their warnings from a standard DEA form and a review of it shows that it "'touched all of the bases required by *Miranda'* and was sufficient to 'reasonably' inform [Perez] of his *Miranda* rights." *Avincola v. Stinson,* 60 F.Supp.2d 133, 159 (S.D.N.Y.1999) (quoting *Duckworth v. Eagan,* 492 U.S. 195, 202–03, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989)). *See also United States v. Anderson,* 929 F.2d 96, 98 (2d Cir.1991) ("We review the warnings not for whether they adhered to a certain form, but for their substance.").

■ *Second,* Perez argues that Agent Plancon vitiated Perez's consent to search his apartment, which Perez otherwise concedes that he freely gave following his arrest, when Perez was warned that "if there is contraband in that apartment, whoever is in that apartment could go to jail for that." Tr. at 53–54. The comment was not made in a threatening manner, but

rather in the context of the agent's discovery that Perez's mother and his fourteen-year old daughter lived in the house where he kept his drug money. *See id.* at 56. Other than this comment, Perez does not claim that the agents made any other threats. This is far from the type of situation "which would overwhelm the frightened prisoner and vitiate consent." *United States v. Arango–Correa,* 851 F.2d 54, 57 (2d Cir.1988). Moreover, Perez signed a consent form that confirms that he was not "threatened, nor forced in any way" and states "I freely consent to this search." Government Exhibit 2.[12] *See also* Tr. at 61. When considering the totality of the circumstances, the evidence clearly shows that Perez's consent to search his home "was the product of an essentially free and unconstrained choice by its maker." *Arango–Correa,* 851 F.2d at 57 (citing *Schneckloth,* 412 U.S. at 225, 93 S.Ct. 2041).

*Third,* Perez argues that the agents' failure to administer the *Miranda* warnings before asking him some questions tainted the subsequent investigation. This argument has no merit. "[T]he dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the *unwarned* statement in the case in chief." *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (emphasis added). "No further purpose is served by imputing 'taint' to subsequent

statements obtained pursuant to a voluntary and knowing waiver."[13] *Id.*

## V. CONCLUSION

The government has shown by a preponderance of the evidence that, prior to the discovery of the cocaine, the agents neither seized Perez nor coerced his consent to the search. The defendant's motion to suppress is therefore denied.

SO ORDERED:

---

12. Perez does not contest the content of the form or claim that a reasonable person in his situation would fail to understand its meaning. Nor does he otherwise claim that the conditions surrounding his decision were coercive.

13. *Miranda* obviously prohibits the government from introducing any statements that the agents may have taken from Perez after arresting him in the elevator but before informing him of his rights. *See* Tr. at 93. However, "the Government does not intend to offer as evidence in its direct case against the defendant any statements made by him to the agents after he was placed under arrest but before he was advised of his constitutional rights." 12/11/01 Letter from Assistant United States Attorney David Siegal to this Court, at 4.